# ATTACHMENT TO COMPLAINT

## A.  HISTORICAL BACKGROUND  PERTAINING TO PLAINTIFF'S SON "WV"

1.   This matter pertains to due process proceedings initiated by the Plaintiff (hereinafter referred to as "the Parent") against the Defendant Ardsley Union Free School District (hereinafter referred to as "the District") on behalf of her son, referred to in the administrative complaint as "WV."

2.  The original due process complaint (IHRS Case No. 545398), dated June 4, 2020, was subsequently amended in September 2020, and then consolidated with a second due process complaint (IHRS Case No. 547659) dated November 17, 2020.

3.   WV is a 19-year old former student of the Ardsley High School ("Ardsley HS"), which is a public school within the Defendant Ardsley Union Free School District (hereinafter referred to as "the District").

4.  In 2004,  WV's family sought residence specifically in the area served by the District, hoping to benefit from the District's reputation for providing high quality public education to its resident students.

5.   WV first received service under the IDEA through the Early Intervention programs.

6.   WV's problem behaviors at the time consisted of difficulties with communication and rigidity that manifested as failure to comply with instructions and that was deemed severe enough to impair his future ability to learn in school.

7.   WV was seen by a pediatric neurologist, Isabel Rapin, who opined WV had Asperger Syndrome—a condition deemed to be among the Autism Spectrum Disorders, in accordance with the *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition* (DSM-IV).

8.   Under the  IDEA's classifiable conditions, WV's behaviors were likewise consistent with the statute's definition of Autism-- a "developmental disability significantly affecting verbal and nonverbal communication and social interaction …that adversely affects a student's educational performance."  Thus, WV was classified as a preschool child with a disability under the IDEA.

9.   For two years, the Committee on PreSchool Special Educatio  ("CPSE") approved for WV to receive intensive full day services, including extended school year (hereinafter designated as "ESY") and the Parent training, provided by the Fred S. Keller School—a preschool that employs Comprehensive Application of Behavior Analysis to Schooling (CABAS).

10.  WV greatly improved under the ABA based methods and his problem behaviors became less prominent.

11.  In 2007, upon his transition to Elementary School, the Parent referred WV for an evaluation by the Committee on Special Education (" CSE") for continued services, but the District then deemed WV ineligible for an IEP for the 2007-08 school year (hereinafter designated as "SY").

12. Because WV's improvement had rendered his manifestations more subtle, the Parent believed his ineligibility was due to the District's perception, then, that WV did not need special instruction.

13. Nevertheless, the District provided WV an accommodation plan under Section 504, for which the Parent believed WV qualified based on his disabilities that resulted in substantial limitations in the major life activities of communication, socialization, and learning.

14.  In January 2008, the District declassified WV altogether and discontinued all services.

15.   In elementary school, WV passed his classes and was promoted from grade to grade notwithstanding his need for prompting to complete assigned tasks.

16.   It was the Plaintiif's understanding at the time, from her experience advocating for MV, that, because WV was doing well in subject matter conventionally deemed "academic"—such as reading, writing, and Math— WV would not have qualified for special education.

17. When he reached middle school, however, WV's difficulties completing assignments in a timely manner became a more significant problem.

18.  Furthermore, WV's difficulties were exacerbated by manifestations of Crohn's Disease—a gastrointestinal condition that substantially limited major life activities pertaining to the bodily function of digestion.

19. To control exacerbations of his Crohn's disease, WV was treated with medications that suppressed his immune system but which, unfortunately, also compromised his ability to ward off infections.

20.  WV also started manifesting depressed mood and harmful behaviors that prompted the school's request for a clearance for WV to return to school, due to concerns regarding his safety in school. WV started seeing private psychiatrists and a private psychologist with whom the school staff communicated.

21.   Because WV's teachers repeatedly emailed the Parent to inform her of missing school work, WV's inability to complete such school work became a source of conflict between WV and the Parent and emotional distress for both, to the point that Dr. Alan Supraner, WV's private psychologist then, advised the Parent to refrain from addressing such issues with WV.

22.   In April 29, 2015, when WV's school performance had deteriorated to the point that he risked failing a subject, the Parent initiated a referral to the CSE requesting a formal evaluation for a disability and WV's need for special education.

23.  In a CSE meeting chaired by Susan Seda, the Asst. Director of Special Education, and held on June 25, 2015, the CSE found WV to be eligible for IEP services under a classification of Emotional Disturbance.

24.  During the CSE meeting, the Parent also informed the CSE of WV's behaviors that were attributed to autism—e.g. his rigidity and how his lack of co-operation may be exacerbated by stressors such as hunger or sleepiness or embarrassment.

25.   The CSE also discussed in detail WV's fatigue and dysregulated sleep cycle that contributed to his difficulties in school, such that WV needed to put his head down on his desk frequently.  At the time, the CSE attributed WV's sleep disturbance to his emotional issues.

26.  In June 2016, William was diagnosed with obstructive sleep apnea—a condition which subjects WV to the effects of sleep deprivation unless he uses a Continuous or Bilevel Positive Airway Pressure (CPAP or BiPAP) machine while sleeping.

27.  In July 2020, William was diagnosed with chronic kidney disease (CKD) in the form of interstitial nephritis, which condition substantially limited his body's ability to eliminate metabolic waste products through the kidneys.

**History of Administrative Procedures Pertaining to WV**

28.  The Parent and District have been involved in an ongoing litigation that was initiated in September 2017 and currently remains before a federal court in the Southern District of New York (*Vinluan v Ardsley Union Free Sch Dist.* (19-cv-10674)).

29. Among the issues presented before the court is the Parent's contention that the instruction WV needed in functional skills were not merely ancillary to academic subjects; rather, they were academic, in and of themselves, in that they comprise learning standards[1]  in an area of New York State's general curriculum,  under the banner of the Career Development and Occupational Studies ("CDOS").

30. As a result of his disabilities, WV failed to achieve certain standards necessary for promotion from grade to grade in that he had failed to demonstrate personal qualities targeted by the curriculum that "generally include competence in self-management and the ability to plan, organize, and take independent action"[2].

---

[1] 8 NYCRR Part 100.1(t):  **State learning standards** means the knowledge, skills and understandings that individuals can and do habitually demonstrate over time as a consequence of instruction and experience.

[2] NYSED CDOS Learning Standards http://www.p12.nysed.gov/cte/cdlearn/documents/cdoslea.pdf .  at pp. 7, 11, 15 (CDOS Learning Standard 3a(3) as described under "Universal Foundation Skills – Personal Qualities")

31. WV's specific deficits in the CDOS learning standards permeated the entirety of his educational experience, inasmuch as, as a student, he was not only required to learn course content in graded subjects but also to demonstrate that mastery to teachers through the timely submission of work completed outside of the classroom.  Thus, WV's educational performance was, and continues to be, adversely impacted by his failure to achieve the elementary[3] level standard that he "complete assignments on time"[4] and the commencement[5] level standard pertaining to "setting goals, monitoring progress, and improving …performance," as exemplified by a student who can "establish a set of personal goals and record progress in attaining them."[6]

32. The Parent contended that the District had failed to meet its obligation to offer WV an IEP to ensure that WV achieved grade-level performance standards in the CDOS as a subject distinct from the traditionally graded "academic" subjects which he was able to otherwise master (albeit with extensive supervision geared towards ensuring assignments are timely submitted).

33.  Moreover, the Parent asserted that, without an IEP or Prior Written Notice (PWN) that indicated that WV was subject to any curriculum modification, WV's promotion from grade to grade, while he continued to fail to meet grade level expectations in the CDOS learning standards, constituted curriculum modification for a known student with a disability that was prohibited under the then ESEA -- tantamount to a denial of a free and appropriate public education ("FAPE") under the IDEA, inasmuch as the IDEA must conform to the ESEA/ESSA.

34. Pursuant to the due process complaint filed by the Parent in September 2017, the parties convened a agreed to have WV return to the Ardsley HS in January 2018.  There he continued to receive instruction and services until schools closed, in March 2020, due to the Covid 19 pandemic.

35. After schools closed due to the pandemic, WV received instruction and services at home, delivered remotely as was intended, then, for all students.

36. In the beginning of the 2019-20 SY, pursuant to the order of an Impartial Hearing Officer (hereinafter designated as "IHO") that was affirmed by a State Review Officer (hereinafter designated as "SRO"), WV underwent an evaluation by Teresa Dana, a Board Certified Behavior Analyst (BCBA), to address the behavioral issues that impede or are expected to impede his learning in his current curriculum as well as his intended postsecondary setting.

---

[3] 8 NYCRR Part 100.1(t)(2)(i): **the elementary** or elementary-level State learning standards and State assessments reflect the knowledge, skills, and understandings all students are expected to know and be able to do by the end of grade four (underline added)

[4] CDOS Learning Standards, p.7 http://www.p12.nysed.gov/cte/cdlearn/documents/cdoslea.pdf

[5] 8 NYCRR Part 100.1(t)(2)(iii): **the commencement** or commencement-level State learning standards and State assessments reflect the knowledge, skills, and understandings all students are expected to know and be able to do upon receiving a high school diploma (underline added)

[6] CDOS Learning Standards, p.15 http://www.p12.nysed.gov/cte/cdlearn/documents/cdoslea.pdf

37. The BCBA observed that WV was served by two teams of professionals—a private one (based at the Montefiore Center for Autism and Communication Disorders and overseen by Dr. Michelle Dunn) and the school based team.  The BCBA recommended that the two services be bridged.

38. On November 21, 2019, the District convened a meeting of the Committee on Special Education (CSE) to review the BCBA evaluation. The BCBA report recommended an action plan that engaged WV in self-reflection and a linking of the self-management skills which he needs to improve to his own intrinsic motivations—e.g. his goal of going to college.

39. The BCBA  also recommended collaboration among his providers towards teaching WV to use the "Balancing Life" planner system created by Dr. Dunn, for which purpose the school psychologist, Dr. Michelle Myers, special educator Doreen Day, and Dr. Dunn did confer with one another.

40. During the CSE meeting, Ms. Day, who acted as WV's case manager and resource room teacher, shared that WV had been unwilling to work on the planner with her.  Nevertheless, she acknowledged that he can be motivated to do so, since she had seen that he had, indeed, filled out the planner.

41. WV also verbalized, during that meeting, his agreement to use the planner, which he had actually updated with the support of Dr. Dunn during his sessions with her.

42. It was discussed during the CSE meeting that it was also necessary for WV to continue to engage in the exercise frequently and regularly to develop proficiency and habit of mind—an activity which can continue in Resource Room.

43. Ms. Day and Dr. Myers confirmed that they had a conference with Dr. Dunn and that they were willing and able to implement the planner and other recommendations from the BCBA as part of a Behavior Intervention Plan (BIP).

44.  The written IEP and BIP pursuant to the November 2019 CSE meeting, while differing in some aspects from the verbal agreements reached at the meeting, were nevertheless consistent with the November 2019 CSE meeting to the extent that the written documents reflected an agreement to implement a BIP geared towards getting WV engaged in the exercise of task analysis and prioritization through the use of the planner system created by Dr. Dunn.

45. While the IEP no longer indicated the Parent training and counseling services, Dr. Myers and Ms. Day continued to meet with the Parent once per quarter/ marking period for that purpose.

46.  Therefore, it is the Parent understanding that the totality of the services the November 21, 2019 CSE meeting members contemplated that WV would be receiving—whether or not they were mentioned in the IEP--consisted of the general education setting with the provision of both in school and private services that included the following:

- Special instruction towards his IEP goals of task analysis, organizational skills, and self-management, in collaboration with Dr. Dunn and utilizing Dr. Dunn's "Balancing Life" planner, delivered by school staff 5 days a week for a cumulative duration of 3 hours a week;
- Individual Counseling 30 minutes twice a week in school
- The Parent training 30 minutes once every marking period for a total of 4 times a year
- Behavior Intervention Plan to target problems related to isolation, withdrawal, and homework completion
- Private counseling sessions at the Montefiore Center for Autism and Communication Disorders every two weeks

47.  After the November 2019 CSE meeting, WV continued to utilize the planner, but in a parent training session held in January 2020, Ms. Day reported to the Parent that he stopped doing so.

48. Ms. Day informed the Parent that, instead, she and WV established a routine wherein he would just sit quietly in her vicinity independently doing his homework from his other classes,  with which subject matter he needed little to no assistance.

49.  The Parent contends, therefore, that the District failed to implement WV's IEP inasmuch as the use of Resource Room as a study hall is not allowed by the NYSED and that WV was deprived of the supplemental instruction that he needed to accomplish his IEP goals—i.e. learn a method of self-management through the consistent use of a planner.

50.  On March 16, 2020, schools closed in response to the Covid-19 pandemic, and, thereafter, the District implemented a continual learning plan by which students can remotely access instructional material and submit assignments online to reflect their engagement in such learning activities.

51.  On March 30, 2020, the District disseminated a general Prior Written Notice (PWN) informing recipients of special education and related services that the services in their IEPs will continue to be implemented by remote instruction.

52.  Dr. Dunn also conducted or supervised sessions with WV remotely.

53.  On April 24, 2020, the District convened a meeting to create WV's exit summary, as required under 8 NYCRR Part 200.4(c)(4) .  However, rather than reveal a student ready for discharge from high school and for postsecondary education, Ms. Day's report revealed a student who was missing many, if not most of his assigned tasks.

54.  Instead of convening an annual review to discuss WV's progress towards his IEP goals and revise the IEP to address WV's evident difficulties, the District proceeded with the Exit Summary Meeting with the intent of having WV proceed with graduation scheduled near the end of June 2020.

55. During the meeting, the Parent expressed concern for WV's persistent, and even worsening, self-management skills.  She informed the meeting members that he would likely need to take a gap year in light of his lack of college readiness and his increased difficulty with keeping up with remotely delivered instruction, which may become the norm, in the setting of the pandemic.

56. Ms. Day attributed his lack of progress in the area of self-management to WV's unwillingness to work on that goal—i.e. due to the rigidity that is the very nature of his disability.

57. Nevertheless, Jeanne Farruggio--the meeting chairperson and the District's Asst. Superintendent for Pupil Personnel Services and Special Education—explained that work on the planner was expected to continue through remote instruction during the pandemic.

58. That said, the absence of  entries in WV's planner since February 2020 indicated that he had stopped working on it during Resource Room even before schools closed in March 2020.

59.  In April 27, 2020, the District started conducting live virtual classroom sessions.

60. School psychologist Michelle Myers also held virtual counseling sessions with WV, and, per WV's report, Ms. Day occasionally participated in those sessions.

61.  Notwithstanding the availability of virtual live sessions, WV continued to fail to meet his responsibilities as a student, to the extent that his U.S. History teacher reported that he was at risk of failing the class for the entire year.

62.  Insofar as credit from his 12th grade U.S. History and Government-Economics class is one of the 22 credits required by the State for the award of a diploma, it was certain that failing the course would result in WV failing to meet the requirements of a diploma.

63. On May 23, 2020 the Parent informed Ms. Farruggio that she disagreed with the planned discontinuation of WV's eligibility for special education, as will result from the scheduled award to WV of a Regents diploma in June 2020.

64. Seeking to distinguish WV's mastery of course content from his deficits in self-management skills, the Parent requested from the District accommodations that WV be given extended time to submit missing assignments, and that his grades reflect the quality of the work he submits and not the lateness of the submissions.

65. At the same time, the Parent recognized that such dissociation of the course content from the CDOS based skill of self management would not remedy WV's deficits in functional skills, nor would his passing grade reflect the CDOS aspect of the curriculum that would have otherwise been reflected in his grade, in the absence of the accommodation.

66. While she requested that WV be allowed to participate in the commencement ceremony with his class, she also requested that WV's diploma be delayed, and she reiterated her request that his eligibility for special education continue so he can continue to work on attaining the CDOS based skills that are addressed by his IEP.

67. It bears noting that, insofar as WV's IEP goals reflected the CDOS based skills he would have needed to demonstrate to pass his graded subjects, her request for extended time to achieve his IEP goals indicated that her request for accommodations regarding WV's grades did not involve a waiver of the curriculum's CDOS based requirements to earn a diploma.

68. Ms. Farruggio proposed to the Parent an IEP amendment without a CSE meeting but only agreed to some, not all, of the accommodations the Parent requested.  In particular, Ms. Farruggio did not agree to Parent's request for an extension of time for WV to work on his IEP goals in which he remained deficient.

69. In a June 4, 2020 email discussing the accommodations she requested, the Parent clarified her request that WV continue to remain eligible for special education because he did not meet the goals of his education program.  The Parent also stated "If a CSE meeting is needed to discuss the unresolved issues further, then please consider this email my request for one."

70.  Ms. Farruggio and the Parent did not come to an agreement with regards to all the proposed IEP changes, thus making inapplicable to the circumstances the provisions in State regulations that allowed for an IEP amendment without a CSE meeting.

71. However, Ms. Farruggio failed to convene a CSE meeting either for WV's annual review, pursuant to 8 NYCRR Part 200.4(f)), or in response to the Parent's specific request for one to address the unresolved requests for accommodations.

72. Therefore, the Parent alleged a denial of participation in decision making and of FAPE, especially in light of the availability of alternative courses of action that a CSE could have discussed and validly offered WV at the time.

73. For example, WV could have been eligible for a high school equivalency (HSE) diploma, obtained through the Regents-HSE Exam pathway[7], which did not require the student to meet all State learning standards, and which would not have terminated WV's eligibility for a FAPE.  Thus, WV could have continued to receive IEP services to help him work on improving his functional skills through an alternative education pathway allowed by the NYSED.

74. It bears noting that, while the District generally implements the policy or practice of annually reviewing IEPs by convening a Subcommittee on Special Education or a CSE prior to the end of

---

[7] The NYSED's memorandum "High School Equivalency Diplomas during COVID-19" is publicly accessible at
http://www.acces.nysed.gov/common/acces/files/hse/hse-guidance.pdf

every school year, there have been other instances when Ms. Farruggio failed to enforce the State's mandate to do so—e.g. at the time that the graduation of WV's brother, MV, was in dispute.

75. Eventually, WV did manage to submit most of his missing assignments, but only with extraordinarily close supervision and repeated prompting and redirection from the Parent, Dr. Dunn and school staff, and his siblings with whom he lived.

76. Furthermore, the Ardsley HS Principal, Danielle Trippodo, offered WV the additional accommodation of a Covid 19 related "medical hardship exemption" for the final marking period's grades, for the purpose of mitigating the adverse impact of the pandemic on WV's grade point average (GPA).

77. The Parent contended that the level of support WV needed to fulfill his academic obligations was tantamount to relieving WV altogether of the curriculum requirement that he independently demonstrate the CDOS learning standards inherent in the accomplishment of the required tasks—a level of mastery that would have been expected from graduating nondisabled students.

78. Therefore, the Parent asserted that WV lacked the functional skills required to earn a diploma, and that the District's award of the diploma, in light of its knowledge of the extensive assistance provided to WV, constituted a curriculum modification that was not properly decided by a CSE nor indicated in his IEP.

79. On June 4, 2020 the Parent filed a due process complaint which specifically invoked pendency, in light of WV's failure to achieve the goals of his educational program—e.g. his IEP goals and the grade level CDOS learning standards without which he would have failed classes he needed to earn a diploma. Thus, the Parent challenged the validity of issuing a diploma to WV at that time.

80. Notwithstanding the Parent's expressed request for pendency, in light of WV's demonstrated deficits in the functional skills required to actually earn a diploma on his own, the District issued WV a Regents diploma dated June 24, 2020 and declared him graduated.

81. During the extended resolution session that transpired over the summer of 2020, the parties discussed possible services for WV.

82. The Parent informed the District representatives to the resolution meeting—Jeanne Farruggio and Susan Seda—that, in light of WV's lack of college readiness and failure to adapt to the remote instruction, his counselor, Dr. Michelle Dunn, had advised that he defer enrollment to his college of choice and, instead, use the 2020-21 SY to continue to work on his self-management skills, which he will need to have first mastered to succeed in college.

83. The Parent put together a program consisting of remote and/or in-person private counseling and special instruction/coaching to address WV's specific areas of weaknesses, combined with college level courses appropriate for his academic strengths, to be used as vehicles for practicing his self-

management skills.  These college level courses came from several online sources, including Coursera, EdX, and Landmark College's Online Dual Enrollment Program.

84. On July 29, 2020,  the Parent provided the District notice that if the District did not provide the student services, she will implement them using her own funds and seek reimbursement.

85. On August 4, 2020, the Parent provided the District notice that the placement she was creating for WV was substantially similar to that provided in his last IEP.

86. The District indicated that it was considering provision of the services the Parent proposed as part of a settlement agreement.

87.  However, while the Parent was awaiting an offer of settlement from the District, the extended resolution period expired without any request from the District for any further extension of time to finalize an offer.

88.  By the time that school year started on September 10, 2020, the District had failed to offer WV any services, including whatever pendency placement it may have deemed to be appropriate.

89. Therefore, the Parent implemented the privately funded program she proposed.

90. On September 14, 2020, the Parent sent to the IHO and the District a copy of  an amended complaint that included events that occurred after she filed her June 4, 2020 complaint, including the District's eventual issuance to WV of a diploma.

91. On September 16, 2020, the IHO granted the Parent permission for the amended complaint.

92. The complaint reiterated assertions made in the preceding complaint filed on June 4, 2020.

93. The Parent's complaint asserted that the District failed to implement the services and behavioral intervention plans (BIP) specified in MV's IEPs—specifically the goals towards WV developing self-management skills and turning in homework on time.

94.  The Parent also alleged that, insofar as WV's IEPs were formulated during the pendency of the proceedings initiated in September 2017, the District's failure to implement the provisions of WV's IEPs constituted failure to implement WV's pendency services.

95. The Parent asserted that the District improperly modified the curriculum requirements for WV without the benefit of a CSE meeting, by issuing a diploma notwithstanding his evident lack of the functional skills that the curriculum required him to have mastered in order to have earned the said diploma.

96. The Parent asserted that the District had failed to provide WV FAPE for the 2020-21 SY insofar as it had failed to convene a CSE meeting prior to WV's graduation, predetermined WV's graduation, and, thereby, denied the Parent participation in the decision making process for WV's placement for the subsequent year--including WV's potential need for ESY in light of his regression and the eventual permanent termination of his eligibility for a FAPE.

97. The Parent also alleged a deprivation of pendency services, notwithstanding the Parent having specifically invoked pendency pursuant to both the 2017 due process complaint that was pending in federal court and the recent June 4, 2020 due process complaint.

98. In addition to IDEA claims, the Parent alleged violations of Section 504/ADA.

99. During a second resolution session, which took place on September 30, 2020, the District representatives—Jeanne Farruggio and Susan Seda--verbalized the District's intent to offer WV the private services the Parent implemented, as part of a settlement for withdrawal of the complaint.

100. Ms. Farruggio also affirmed the District's intent to continue its policy/practice of requiring from the Parent a waiver of the right to file suits under non-IDEA statutes, such as Section 504 or the ADA.

101. However, the representatives indicated that their authority to offer settlement did not extend to making offers of certain remedies available under Section 504/ADA but not available under the IDEA—e.g. compensatory damages.

102. The Parent anticipated protracted negotiations involving a waiver of her and WV's rights to file non-IDEA claims. Therefore, she requested that the question of WV's pendency placement during the resolution session be addressed.

103. The District representatives took a break from the resolution meeting then returned to inform the Parent of its position that the student was not entitled to pendency due to his graduation. However, they also contended that, if pendency was applicable, they surmised it would be placement in Ardsley HS.

104. The Parent shared her understanding that pendency constituted the services provided in the IEP.

105. In light of the District's apparent willingness to offer funding for WV's private services as compensatory services, and since WV was already making progress with his private providers, the Parent requested that the District consider continuing funding for those same services WV was already receiving and making it his pendency placement.

106. The District representatives informed the Parent that they will discuss the matter with the District's legal counsel prior to making a final decision regarding the issue of pendency.

107.    In light of the disagreement regarding the student's eligibility for pendency and the exact nature of pendency services, the Parent requested guidance from the IHO, who convened a pre-hearing conference that was held on October 9, 2020.

108.    During the prehearing conference, the IHO requested the parties to state their respective positions regarding the specific issues of the student's graduation status, the statute of limitations of the Parent's claims pertaining to the 2017-18 SY, and the doctrines of *res judicata* and *collateral estoppel*.

109.    The IHO then instructed the Parent to submit a motion for an interim order of pendency and the District to submit a partial motion to dismiss complaints arising from the 2017-18 SY on the grounds of statute of limitations, *res judicata*, and *collateral estoppel*.

110.    The IHO allowed each party to reply to the opposing party's motion and to submit exhibits in support of their own motion.

111.    The District's counsel—Carol Melnick--expressed confusion about the Parent's concept of pendency and hinted that the District may be willing to consider allowing WV to participate in high school courses.  However, the District's counsel then acknowledged that a return to the high school program was not appropriate for WV and alluded, instead to compensatory services offered by the District as settlement.  She then attempted to enlist the assistance of the IHO in formulating a resolution agreement, which the IHO declined to do.

112.    The Parent, on the other hand, indicated that she was considering the District's initial settlement offer, but lamented that the negotiations took time, and in the meantime, she was paying out-of-pocket for services for WV.  Therefore, she requested that the IHO address the issue of pendency while the parties continued to discuss the terms of settlement.

113.    The District stood by its position that WV remained ineligible for pendency and never made an offer of pendency services of any kind to assume the Parent's burden of providing services while settlement negotiations were ongoing.

114.    The parties continued to discuss settlement terms prior to the deadline for submission of the motions, and the District offered the Parent funding for the private services she had implemented for WV if she would withdraw her complaint.

115.    However, the District also demanded that the Parent waive her and WV's rights to filing any other suit regarding matters "which arise from or are in any way related to matters or issues raised" in the latest complaint.

116.    In light of the similarities of issues raised in the current complaint and those raised in two other cases--concerning WV and his brother MV-- deemed by the federal court to be "related" to

one another, and in light of allegations in the current complaint that the District failed to implement pendency services pursuant to the pending federal proceedings, the language in the settlement agreement gave the Parent cause for concern.

117.     In an email dated November 9, 2020, the Parent explained to the District her concern that agreeing to the terms of settlement would not waive just her right to file a future suit regarding the 2018-2020 SYs, but could also interfere with the complaints already in federal court.[8]

118.     The District informed the Parent that her concerns would be brought to the attention of the District's counsel, but then, ultimately, failed to offer to modify the relevant clauses in the settlement agreement.

119.     Thus, the terms of resolution could not be finalized without including the complaints pending in federal court, and the Parent continued to privately pay for the services she could afford while the proceedings were ongoing.

120.     Guided by the restrictions on the subject matter set by the IHO's instructions, the Parent submitted arguments limited to those issues involving the statute of limitations, the question of *res judicata* and *collateral estoppel*, and those issues that may be needed to determine the student's eligibility for an interim order of pendency—on the grounds that the validity of graduation was challenged--and the content of that placement.

121.     The Parent refrained from addressing other issues raised in her complaint but not included in the IHO's instructions—e.g. the request for reimbursement for an ESY program, WV's eligibility for compensatory education based on a failure to implement IEPs and pendency services, or remedies for Section 504 violations.

122.     Nevertheless, in light of recent developments in case law regarding pendency placements, the Parent's affidavit and memorandum of law consisted of the establishment of multiple premises:

- that functional skills in organization, time management, and the timely submission of homework constituted a component of the general curriculum, under the banner of Career Development and Occupational Studies (CDOS), and that, as such their mastery is included in the requirements for the award of a diploma;
- that WV was eligible for pendency services even after the District issued a diploma in light of the complaint's challenge to the validity or appropriateness of a diploma at that time, insofar as WV had failed to demonstrate the skills the curriculum demanded of diploma recipients;

---

[8] It bears noting that the issues raised in the pending federal complaints also involved the District's policies and practices pertaining to the CDOS standards and a contested graduation that form bases for claims under the IDEA, Section 504 of the RA, the ADA, and constitutional laws, and, thus can be related in some ways to the recent events and issues.

- that WV's pendency placement consisted of remotely delivered services, in light of the pandemic;
- that, in light of the District's failure to provide pendency services, the Parent was entitled to change the service providers as long as the services provided were substantially similar to the ones the student previously received

123.    To support her contentions, the Parent submitted in her binder of exhibits examples of the expansive options available through WV's pendency placement in the Ardsley HS general education program—e.g. independent studies for elective courses, college classes for dual credit or specific dual enrollment programs, online courses, Advanced Placement courses—that illustrated how the courses and services provided to WV are substantially similar to those that could have taken through WV's prior placement.

124.    The Parent also provided email exchanges and samples of the work WV was doing with his private providers to demonstrate its substantial similarity to the services that he should have been receiving through his IEP.

125.    The District's counsel also expressed her understanding that the motions were to be limited in scope, as she heralded her reply to the Parent's motion with the following statement:

> "The parent's Affidavit and Memorandum of Law seeks to prematurely argue issues that are beyond the scope of the Impartial Hearing Officer's ("IHO") direction in the pre-hearing conference.  To that end, the District will only respond to the following issues specifically requested for discussion by IHO Jeffrey Schiro."

126.    Thus in its reply in support of its "Position Statement and partial Motion to Dismiss," the District addressed only the issues of *res judicata* and *collateral estoppel*, pendency, statute of limitations, and WV's graduation status.

127.    Insofar as the District's position statement did raise the argument that the student's graduation posed as a bar to further FAPE and public education, the Parent did assert that graduation was improper in light of the IDEA violations committed in the process—i.e. the inappropriate modification of the requirements for a diploma and the District's failure to convene a CSE meeting to discuss the Parent's concerns about graduation, which the Parent alleged to have constituted a deprivation of participation in decision-making and a denial of FAPE

128.    In response to the District's argument that the Parent was not allowed to unilaterally change the student's pendency placement, the Parent argued that it was the District—not the Parent—who unilaterally changed pendency placement by issuing a diploma--even after the Parent invoked pendency in her June 4, 2020 due process complaint—and then by failing to offer a placement by the start of the 2020-21 SY.  Therefore, the Parent was left with no alternative but to seek private placement.

129.    In response to the District's argument that the court's decision in *Cronin* did not apply to this matter because the Parent had purportedly disputed pendency placement, the Parent clarified that no offer was disputed because no offer of pendency services was ever made by the District, which maintained its position that WV was not entitled to pendency in the first place.

130.    Insofar as the District asserted that, had WV been eligible for pendency, the pendency placement would have consisted of Ardsley HS, the Parent asserted that pendency did not necessarily require a specific school, but instead consisted of the general educational program in which the student was placed.

131.    That being said, and to the extent that the student's placement is intended to implement the pendency IEP, Parent requested a change in the service providers insofar as the Ardsley HS staff had been unable to implement WV's IEP.

132.    In addition, in light of the progress WV had been able to make with his private service providers, the Parent asserted that his return to Ardsley HS would constitute bad faith, as the change would likely promote regression instead of progress.

133.    In its November 20, 2020 reply to the Parent's motion for an interim order of pendency, the District reasoned that it offered WV postgraduation services during the resolution sessions, and the Parent had refused the offers.

134.    However, the District omitted the fact that such offers were contingent upon the Parent's withdrawal of the complaint and the waiver of rights to later file any suits in court regarding issues that are in any way related to the current complaint. Thus, the District's offer of services cannot be deemed equivalent to an offer of the pendency services to which WV was entitled.

135.    The District's counsel also adduced, as evidence that the District provided FAPE, the "accommodations" the District discussed with the Parent—including the offer to WV of the Covid 19 Medical Hardship Exemption.

136.    Notwithstanding the District's own argument that remotely delivered instructions and services did not constitute a change in a student's placement—insofar as such as remote instruction had become an authorized alternative mode of instruction delivery—the District insisted that, to the extent that pendency is applicable, WV's pendency placement consisted of in-person instruction in Ardsley HS.

137.    Since the replies were submitted simultaneously on November 20, 2020--the deadline set by the IHO--and since the IHO's instructions only allowed for one response, the Parent did not have an opportunity to submit a surreply to the new defenses and exhibits raised by the District in its reply to the Parent's motion.

138.    Consistent with the IHO's instructions regarding the scope of the motions, neither party addressed other issues raised in the complaint for which relief may be available—e.g. reimbursement for the ESY program that WV attended, compensatory services for unimplemented pendency services, or remedies for Section 504 violations that may be distinct from those remedies for a deprivation of FAPE under the IDEA.

139.    During the course of the proceedings, the Parent had requested additional opportunities to amend her complaint, but both the District and the IHO denied further amendments while the parties were engaged in the exchange of motions.

140.    On November 17, 2020, the Parent submitted a second complaint alleging, among others:

- that the District's failed to convene an annual review of the IEP at the end of the 2019-20 SY, as mandated under 8 NYCRR Part 200.4(f), in light of evidence that WV was not meeting his IEP goals;
- that the District developed a deficient transition plan for WV in that it failed to convene a CSE to discuss alternative courses of action that could have been more appropriate for WV, in light of his circumstances—e.g. dual enrollment or an alternative education placement leading to a high school equivalency (HSE) diploma
- that the District failed to follow the action plan recommended by a Board Certified Behavior Analyst (BCBA)
- that the District failed to follow its own Behavior Intervention Plan when it issued a Regents diploma  to WV
-  that the failure to convene a CSE meeting and WV's predetermined graduation at the age of 18 years deprived the Parent of participation in the decision making regarding WV's placement for the subsequent school years, until WV turned 21 years old, for which WV could have remained eligible for FAPE.

141.    It bears noting that, in light of Parent's challenge to the District's assertion that the Parent disputed pendency, and her clarification that the District never offered pendency placement in the first place,  the District's continued failure to offer pendency services of any kind while awaiting the IHO's interim decision belied its implied assertion that it did not offer pendency on the basis that the Parent had purportedly "disputed" the placement.

142.    On December 7, 2020, the IHO issued an order consolidating the September 2020 amended complaint with the November 17, 2020  complaint.

143.    The IHO gave the parties no notice or opportunity to argue or submit evidence addressing the issues raised in the November 17, 2020 complaint.

144.    In a resolution meeting held on December 9, 2020 pursuant to the second due process complaint, the District summarized its offer of services for WV in exchange for the withdrawal of the Parent's complaint.

145.    During the meeting, the Parent reiterated her concern that the language in the offer of settlement can potentially adversely interfere with the related litigation then pending in federal court, and not just future suits based on the events that formed the basis of the current administrative complaint.  Again, the District declined to change the language of the resolution agreement, and the District failed to offer pendency services for WV.

146.    Thus, by placing the Parent in the position of having no recourse but to privately fund interim services for WV, notwithstanding WV's right to pendency services, the District attempted to coerce the Parent into the waiving her rights to file suits, including potential collateral suits or amendments to the related federal complaints under the ADA and Section 504, in the event that such suits may be warranted.

147.     In a decision released on December 31, 2020, the IHO dismissed the entirety of the Parent's consolidated complaints--including those issues not raised in the exchange of motions--on the grounds of mootness, in light of the student's graduation and a purported unavailability of relief without a showing of a gross violation of the IDEA.

148.    The IHO also held that, having graduated, WV was ineligible for pendency, but then added that, should pendency be deemed to apply on appeal, the pendency placement should be the Ardsley HS.

## Request for Review (RfR) of the IHO's Decision by the Office of State Review

149.    On January 7, 2021, the Parent served upon the District its Notice of Intention to seek a review by the Office of State Review.

150.    On February 8, 2021, the Parent filed her Request for Review by the SRO (hereinafter designated as "RfR") of the IHO's decision.

151.    The District offered no pendency services during the course of the State review and the Parent continued to fund private services for WV.

152.    In her RfR, the Parent asserted that she was denied due process in having been denied notice of the IHO's intent to rule on the entirety of the complaint, and notwithstanding his instruction to limit the scope of the motions to the issues of pendency, statute of limitations, *res judicata*, and *collateral estoppel* as these last 3 issues pertained to the 2017-18 SY.

153.    The Parent argued that she was not given notice of a motion to dismiss the entire complaint--—which by then included the two consolidated complaints-- on the grounds of mootness, and was, therefore, denied the opportunity to present an argument in defense.

154.    The Parent asserted that the IHO's ruling of mootness was arbitrary and capricious insofar as it was based on the <u>presumed</u> appropriateness of awarding WV a diploma and the presumed

unavailability of relief, and was not a rational conclusion based on facts contained in the hearing record.

155.     The Parent asserted that the IHO erred in deeming the entire complaint moot when relief could have been available for some issues, if not all.

156.     The Parent asserted that the IHO erred in failing to recognize that relief in the form of compensatory services was available to the Parent and WV under circumstances that did not require a finding of gross violation of the IDEA – e.g. the Parent's claim of violations under Section 504 or of the District's failure to implement pendency services, or the student in question being under 21 years of age.

157.     The Parent asserted that the IHO denied her due process by deeming her complaint to be outside the scope of the impartial due process hearing and failing to adjudicate it as a claim of improper curriculum modifications that were not discussed by the CSE or stated in the IEP, thus constituting a denial of FAPE under the IDEA.

158.     As such, the Parent asserted that the IHO erred in merely accepting the District's award to WV of a diploma as a per se indication that WV received FAPE and failing to scrutinize the accuracy or appropriateness of those assertions, in light of the evidence presented.

159.     The Parent asserted that the IHO erred in failing to recognize that the District's offer of accommodations were distinct from the curriculum modifications that were implemented instead, and that while the Parent had agreed to temporizing measures,  those measures did not include an alteration of the level of achievements a student is expected to ultimately demonstrate at the time of exit from high school with a regular diploma.

160.     The Parent asserted that the IHO's conclusion that the student met the State's requirements for a regular diploma was not supported by the hearing record, insofar as there is no evidence in the hearing records that the student met all the criteria for a diploma defined under the IDEA §300.102(a)(3)(iv) and 8 NYCRR Part 100.5(a)(3).

161.     Specifically, insofar as the IDEA definition of a diploma requires one that is "fully aligned with State standards"  and the State standards under 8 NYCRR Part 100.5(a)(3) stipulates that the student's earned "credit[s] shall incorporate the commencement level of the State learning standards" including those standards for "family and consumer sciences; and career development and occupational studies,"  the Parent pointed out that the record on which the IHO relied—i.e. the student's report card and transcript—fail to mention those subjects and, therefore, fail to support the finding that those credits were actually earned.

162.     The Parent asserted that the IHO erred in failing to find that the student's deteriorating functioning required an annual review, by the CSE, of his ability to meet his IEP goals and graduation requirements.

163.    The Parent asserted that the IHO erred in failing to find that, where the Parent and District disagree on the contents of an IEP amendment, then an amendment without a CSE meeting (8 NYCRR 200.4[g][2]) will not suffice, and that the District is obligated to convene a CSE.

164.    The Parent asserted that the IHO erred in failing to hold that the District violated the IDEA when it  failed to convene a CSE meeting prior to WV's graduation in response to the Parent's request for one and the student's demonstrated need for one.

165.    The Parent asserted that, that the IHO erred in failing to hold that the District's failure to grant the Parent a CSE meeting,  and its reliance, instead, on a discussion between the Child Study Team, the principal, and the Asst. Superintendent for Special Education, to which discussion the Parent was not invited, constituted a denial of  parental rights under the IDEA "to participate in meetings with respect to the identification, evaluation, and educational placement of [her] child" (20 U.S.C. §1415[b][1])—and a denial of participation in decision making that constituted a denial of FAPE.

166.    The Parent asserted that the IHO erred in failing to find that the District's failure to invite her to a live exchange of ideas with the school staff deprived her of the benefit of knowing the staff's observations and ideas and of the opportunity to ask questions,  thus depriving her of information she needed to make a determination and provide informed consent regarding the appropriateness of the option that was eventually implemented—e.g. the use of the Covid-19 medical hardship exemption to not only preserve WV's GPA, but also to surreptitiously expedite WV's exit from high school before he can demonstrate achievement of  the commencement level learning standards in all areas of the curriculum, including CDOS.

167.    The Parent asserted that the IHO erred in failing to hold that the District's decision to convene an Exit Summary meeting instead of a CSE for an annual review, in light of WV's deterioration in functioning and risk of failing a class required for a diploma, constituted a predetermination of his change in placement through graduation and a denial of FAPE by virtue of denial of the parental participation in that decision making process.

168.    The Parent asserted that the IHO erred in failing to find that the District's graduation of WV and refusal to provide pendency services, notwithstanding the Parent having invoked pendency prior to graduation, constituted predetermination of the termination of WV's services and a refusal to reconsider that termination under any circumstances, even when faced with an automatic injunction.

169.    As a reflection of her November 17, 2020 due process complaint that was consolidated with the first complaint, the Parent asserted that, in light of the change of placement through graduation being permanent, and WV still had 3 years before he turned 21 years old and became ineligible for FAPE under the IDEA, by reason of age, the IHO erred in failing to hold that the District denied the Parent participation in that decision making for the subsequent 3 years after graduation, which predetermination constituted a gross violation of the IDEA that warrants compensatory services.

170.     The Parent asserted that the IHO erred in failing to recognize that some violations alleged by the Parent—e.g. a failure to implement pendency services—may be deemed to constitute *per se* harm and gross violation of the IDEA, regardless of the student's graduation.  Thus the IHO erred in deeming the entire complaint moot on the basis of the unavailability of compensatory education as a remedy.

171.     The Parent asserted that the IHO erred in failing to find that it was the District—not the Parent—who unilaterally changed the student's pendency placement when it graduated the student even after pendency was invoked, then failed to provide pendency placement for the following school year, while the due process proceedings remained ongoing.

172.     The Parent asserted that the IHO erred in failing to find that by discharging WV from Ardsley HS then ignoring the Parent's request for pendency services, the District implicitly agreed to the provision of pendency services by the Parent at a location outside of Ardsley HS, insofar as the automatic injunction inherent in the IDEA's pendency provision must be followed somehow.

173.     The Parent asserted that, in light of the expansive course options available through the Ardsley HS general curriculum—including independent studies for elective courses, college classes for dual credit or enrollment in specific dual enrollment programs, online courses, internship experiences, career and technical education, among others—the IHO should have found that Parent's private program was substantially similar to options available through WV's pendency placement in Ardsley HS

174.     In its response to the Parent's RfR, the District disagreed with the Parent's every challenge to the IHO's decision, with no apparent concern for the truth or falsity of many of its Answers insofar as, for most instances, it offered little explanation to support its position other than to refer to the IHO's decision that was challenged in the first place.

175.     For example, the District disagreed with the Parent's allegation that the IHO denied her due process in dismissing the entire complaint by summary judgment, on the grounds of mootness, without providing the parties full opportunity to present arguments pertaining to all issues raised in the complaints.

176.     Likewise, the District disagreed with the Parent's assertion that the IHO's decision was arbitrary and capricious and that the records on which the IHO relied—WV's Ardsley HS report card and transcript—do not reflect achievement of the commencement level learning standards required by the State for the award of a diploma in the areas of CDOS and Family and Consumer Sciences (FACS) (See 8 NYCRR Part 100.5(a)(3)).

177.      However, the District then sought to support its argument by asserting, in its memorandum of law, allegations that were not contemplated in the IHO's decision or contained in the hearing record—e.g. the manner by which the District chose to instruct and assess WV's performance in the CDOS learning standards.  Thus, by relying on purported evidence not contained in the hearing

record, the District affirmed that the hearing record is incomplete and inadequate to support the
IHO's decision, but it refused to acknowledge that fact.

178.      The Parent requested from the SRO, as relief, that the IHO's ruling be reversed; that the SRO
adjudicate or remand for adjudication to another IHO the issues improperly deemed moot; hold that
WV is deemed eligible for compensatory services for gross violations of the IDEA and pendency
services; hold that the Parent's private program was appropriate for the purpose of both pendency
and for compensation for the denial of FAPE; hold that the District should reimburse the Parent for
services she had, thus far obtained in light of the District's refusal to provide the said services;  and
any other relief the SRO deemed appropriate.

179.      On March 26, 2021, the Office of State review mailed a decision rendered by SRO Carol
Hague, who was the same SRO that rendered the decision currently submitted for judicial review in
federal court.

180.      The SRO dismissed the Parent's appeal.  Thus, this request for judicial review ensued.

181.      It bears noting that in early 2021, the Parent and WV needed to pause some of WV's classes
due, in part, to an exacerbation of a medical condition as well as financial constraints.

182.      WV continues to work with his private counselor on self-management skills and transition
planning using activities geared towards career exploration as vehicles for learning the said skills.
Such activities include creating a resume, going on job interviews, and undertaking a community
based internship.   Consistent with the BCBA's recommendation that WV link the skills he needs
to develop to a motivation, this process also assists WV in identifying goals that can serve as
intrinsic motivators.


## B.   HISTORICAL BACKGROUND REGARDING  OTHER RELATED COMPLAINTS FILED BY THE PARENT AGAINST THE DISTRICT AND WHICH ARE REFERENCED HEREIN AS COMPARATORS

### 2016 and 2017 Complaints Pertaining to MV

183.       In September 2016, the Parent filed, on behalf of another son, MV, a due process complaint
which was withdrawn and refiled in June 2017.  The Parent sought tuition reimbursement for
having unilaterally enrolled MV in the Step Forward program—a nonpublic school program for
high school students in transition to the postsecondary setting, based in Gateway Community
College (GCC) in New Haven, CT.

184.      The Parent also asserted in her complaints regarding MV that the District had improperly
issued to MV an Ardsley HS diploma prior to his having completed the requirements of said
diploma and while he was not enrolled in Ardsley HS, but was, instead, enrolled in Step Forward

and taking college classes in the GCC and in the Westchester Community College (WCC) campuses.

185.    In the matter pertaining to MV, the District accessed MV's college records and transferred the privately funded college credits earned at WCC to MV's Ardsley High School transcript without MV's knowledge and consent, and improperly justified the misappropriation of the credits and the issuance of an Ardsley HS diploma by misrepresenting WV's enrollment at WCC as constituting enrollment in Ardsley HS.

186.    After exhaustion of the IDEA's administrative procedures, the Parent and MV filed a complaint in federal court in July 2019, requesting a judicial review of the decision of the SRO (*Vinluan v. Ardsley Union Free School District (7:19-cv-06496)*).  The Parent also alleged, among others, that:

- the District's violated Section 504 of the Rehabilitation Act (RA), of the American with Disabilities Act (ADA), and constitutional rights under Sections 1983 and 1985 based, in part, on the District's issuance to MV of an Ardsley HS diploma when he was not enrolled in Ardsley HS;
- the District engaged in a policy/practice of not recognizing functional skills included in the CDOS learning standards as curriculum requirements.

**September 2017  Complaint Pertaining to WV**

187.     In September 2017, the Parent filed a due process complaint on behalf of her son, WV.  This complaint was amended in October 2017, then consolidated with a second complaint filed in June 2018.  The complaints sought, among others, reimbursement for WV's unilateral private placement in Westfield Day School as a result of the District's having deprived WV of FAPE under the IDEA due, in part, to its failure to perform a functional behavioral assessment (FBA) and create a Behavioral Intervention Plan (BIP) to manage WV's behaviors that interfered with his learning.

188.    After exhaustion of the IDEA's administrative procedures for her consolidated complaints for WV, the Parent filed a complaint in federal court  (*Vinluan v. Ardsley Union Free Sch. Dist., 19-cv-10674*), requesting a review of that portion of the SRO's decisions which were adverse to her and WV, and alleging, among others, that:
- the District violated  Section 504 of the RA, the ADA, and constitutional rights under Sections 1983 and 1985
- the District engaged in a policy/practice of not recognizing functional skills included in the CDOS learning standards as curriculum requirements
- the District failed to adequately monitor progress in the functional skills included in the CDOS learning standards, as indicated by the lack of the specific <u>requirement</u> that report cards mention progress in that subject matter.

**2018 Complaint Pertaining to DV**

189.    In July, 2018, the Parent filed a due process complaint on behalf of her son, DV, for the District's failure to identify and evaluate DV as a student with a disability under the IDEA and to provide services through an IEP.  This complaint was initially dismissed by the IHO, which decision was reversed by the SRO on appeal.   Claims of systemic violations committed by the District pursuant to its policies and practices are included in (*Vinluan v. Ardsley Union Free School District (7:19-cv-06496)*).

**Issues Common to Multiple Complaints**

190.    In all of Parent's  due process complaints, Parent included complaints under Section 504, which the District refused to adjudicate on the grounds that the District has opted to deal with allegations of Section 504 through its own internal administrative processes and not through the impartial hearing process.

191.    In all of Parent's due process complaints, Jeanne Farruggio—who also served as the District's Section 504 co-ordinator—served as either witness and/or representative to the Resolution Meetings.

192.    During the resolution meetings for DV and in this current matter for WV, the District's representatives have indicated that they did not have authority to offer compensation other than those allowed under the IDEA, notwithstanding the Section 504 violations included in the complaints.

193.    As of the date of this complaint, the District has not yet informed Parent of any investigations or resolutions related to the Section 504 complaints of which the District's Board of Education and Ms. Farruggio was notified through the due process complaints.

194.    As indicated in this complaint, the District continues to fail to require that the District's high school report cards specifically include a report of a student's progress towards the curriculum's CDOS learning standards, notwithstanding that issue having been brought to its attention in Parent's prior federal complaint *Vinluan v. Ardsley Union Free Sch. Dist., 19-cv-10674.*

## ALLEGED VIOLATIONS

### Count I
### Request for Judicial  Review of the  Decision of a
### New York  State  Review  Officer (SRO) – SRO Decision No. 21-048
### IDEA and  New York Education Law
(The Parent and WV against the Ardsley UFSD)

195.     Parents restate the preceding paragraphs  as if set forth in full herein.

196.    The Parent and WV are parties aggrieved by the ruling of the SRO in *Application of a Student with a Disability, SRO Appeal No. 21-048* (See the attached Parent's Exhibit A or access the document at https://www.sro.nysed.gov/common/sro/files/Decisions/2021/pdfversion/21-048.pdf , hereinafter referred to as "PEx A"), as set forth below.

**Denial of Due Process**

197.    SRO Carol Hague failed to comply with her ministerial duty, under New York State Law (8 NYCRR 279.1[c]), to recuse herself from this appeal, insofar as the issues raised for review involves a prior appeal of a decision which she rendered (*Application of a Student with a Disability*, Appeal No. 19-053) and the still pending decision in that matter puts under scrutiny her analysis of issues similarly raised in the current complaint—e.g. the failure to distinguish accommodations from curriculum modifications.  Thus, she may have a personal or professional stake in the outcome of both cases.

198.    Furthermore, in that former proceeding, SRO Hague was involved in the identification, evaluation, program or placement of the student who is the subject of the hearing and also has personal knowledge of the disputed evidentiary facts regarding the 2017-18 SY—e.g. whether or not *res judicata* and *collateral estoppel* apply.

199.    The SRO erred in failing to find that the IHO denied the Parent due process by issuing a summary judgment on the entire September 2020 amended complaint without providing the parties due notice of his intent to rule on all of the issues raised in that complaint, and without giving the parties an opportunity to submit any additional evidence or arguments regarding the other issues raised in the complaint but not addressed through their exchange of motions.

200.    The SRO erred in failing to find in the transcript of the prehearing conference as well as in the motions of the parties themselves that, during the October 9, 2020 prehearing conference,   the IHO restricted the scope of the issues to be addressed in the parties' exchange of motions to those for an interim order of pendency and, for the claims pertaining to the 2017-18 SY, the statute of limitations and the applicability of the doctrines of *res judicata*, and *collateral estoppel*.

201.    The SRO erred in failing to recognize that the District, likewise, acknowledged the IHO's restriction of the scope of the motions when, in its Reply to the Parent's Motion, it alleged:

"The parent's Affidavit and Memorandum of Law seeks to prematurely argue issues that are beyond the scope of the Impartial Hearing Officer's ("IHO") direction in the pre-hearing conference.  To that end, the District will only respond to the following issues specifically requested for discussion by IHO Jeffrey Schiro."

202.    The SRO and the IHO erred in finding that WV's purported graduation rendered moot the Parent's request for pendency services on the basis that no remedy was available (See also Paragraphs 266-267 below).

203.    Regarding the Parent's motion for an interim order of pendency, the SRO erred in failing to find that the IHO erred in failing to address and adjudicate Parent's <u>challenges to WV's graduation</u>, which challenges included WV's failure to demonstrate having achieved commencement level learning standards in  CDOS and the District's failure to convene a CSE meeting prior to WV's graduation,  thus depriving WV of FAPE by denying the Parent participation in the decision making process regarding WV's  change in placement for the next school year.

204.    The SRO erred in failing to hold that the IHO denied the Parent due process by consolidating the November 17, 2020 complaint with the preceding September 2020 complaint prior to, then, dismissing <u>both</u> through a summary judgment *(See PEx A p. 3)* without giving the parties an opportunity to offer evidence and arguments regarding all issues raised in the November 2020 complaint.

205.    Insofar as the motions exchanged by the parties pertained only to the September 2020 amended complaint, the SRO erred in deeming, "as a threshold matter" *(See PEx A p. 6)* that the Parent was put "on notice" of a motion to dismiss "every school year at issue," by the District's stated position in its motion,  and that the Parent was given an opportunity to argue the question.

206.    The SRO erred in failing to find that, in the September 2020 amended complaint, the school years "at issue" involved those up to the 2020-21 SY, but in the  November 17, 2020 due process complaint, the Parent expanded the scope of the complaint to include a claim for a denial of FAPE for <u>all school years subsequent to WV's predetermined graduation, for which WV could have remained eligible for FAPE</u> —i.e. up to and including the 2022-23 SY, wherein WV turns 21 years old.

207.    The SRO erred in only acknowledging <u>pages 1-2</u>[9] *(See PEx A p.3)* of the November 17, 2020 complaint and improperly ignored Paragraph  #14 of the Parent's RfR, which contained the Parent's citation of Paragraphs Nos. 49-53[10] of that second complaint ("<u>*DPC2 ¶¶ 49-53"*</u>), and which  alleged that the District denied WV FAPE for all subsequent years in which he could have remained eligible for FAPE, until he reached the age of 21 in March, 2023.

208.    Insofar as the November 17,  2020 complaint was not consolidated with the preceding amended complaint until December 7, 2020[11]—i.e. <u>after the November 20 deadline for submitting all motions</u>— and the IHO then dismissed the entire consolidated complaint on December 31, 2020 *(See PEx A p. 3)* without giving a notice of his intent to issue the summary judgment on the entire consolidated complaint or an opportunity to address the second complaint, the SRO erred in failing

---

[9] Since the IHO re-labeled the exhibits the Parent submitted, and the Parent was not provided a copy of the relabeled set of exhibits sent to the SRO, it is unclear to the Parent which page the SRO designates as "21" in her citation "see Parent Ex. C at pp. 1-2; 21" on page 3 of the SRO's decision.

[10] The Parent refers to the Paragraphs numbered 49-53 in the complaint dated November 17, 2020, not the copy of the September 14, 2020 complaint attached thereto.

[11] The SRO erroneously indicates the date of the decision to consolidate the complaints to be December 12, 2020 (SRO p.3) but the document itself and the email to which it was attached when sent to the Parent were dated December 7, 2020.

to hold that the Parent was denied due process in having been deprived of the opportunity to address the issues raised in her November 2020 complaint and the District's November 30, 2020 Answer.

209.    Thus, the SRO erred in failing to address Parent's arguments in response to the District's Reply to her motion for an interim order of pendency and to the District's Answer to the second complaint, which arguments she submitted in her RfR, and which included, among others:

- that the District did commit a gross violation of the IDEA by predetermining WV's graduation and depriving WV of any education for a substantial period of time between his graduation and the year when WV turned 21 years old;
- that the Parent had agreed to <u>accommodations</u> as temporizing measures to mitigate damage to WV's academic record but not to the curriculum <u>modifications</u> that the District instead effectually implemented to facilitate WV's exit from free public education;
- that the District acted with bad faith and gross misjudgment in its insistence that pendency placement, if provided, would consist of "in-person" services for WV, notwithstanding the universal precautions undertaken to limit in-person interactions through remote learning during the pandemic and the District's knowledge of WV's compromised immunity and risk for serious illness.

210.     To the extent that remedies may be available for some of the Parent's claims even after the student had graduated, or even without a demonstration of a gross violation of the IDEA, the SRO erred in holding that the Parent's awareness of the District's position regarding graduation constituted due notice of the IHO's intent to dismiss, on the grounds of mootness, such claims as those for reimbursement, for compensatory services for a student less than 21 years old, for remedies under Section 504 violations, and for compensatory services for the District's failure to implement the student's IEP and pendency services.

**<u>Abuse of Discretion/Authority</u>**

211.    The SRO erred in failing to hold that the IHO's ruling regarding mootness and were arbitrary and capricious in that they were not based on sound reasoning rooted in evidence or facts, but, rather, on presumptions that do not apply to the student's circumstances, as set forth below.

212.    The SRO and IHO erred in finding that, under the IDEA, an award of compensatory services to WV, who is a student under the age of 21, requires a showing of a gross denial of FAPE. Thus, the Parent's claims should not have been deemed moot and dismissed on the erroneous premise that WV was ineligible for compensatory services.

213.    The SRO erred in failing to find that, to the extent that the award of the Covid 19 Medical Hardship exemption evinced WV's regression, which in turn warranted reconsideration of WV's eligibility for graduation and consideration for ESY services, and the Parent was requesting reimbursement for an ESY program—not compensatory services—the Parent's request for

reimbursement should not have been dismissed by the IHO as moot on the grounds of WV's presumed ineligibility for compensatory services.

214.    The SRO erred in failing to address the Parent's assertion that, in and of itself, the failure to implement pendency services may be considered a gross violation of the IDEA which warrants compensatory services.    Therefore, the Parent's claims for the District's failure to implement pendency services during the 2018-2020 SYs as well as for the 2020-21 SY should not have been rendered moot by WV's purported ineligibility for compensatory services.

215.    The SRO erred in failing to address the Parent's contention that the material deviation from services prescribed in an IEP may be considered harm, *per se*, such that educational harm does not need to be demonstrated for an award of compensatory services.    Therefore, the Parent's claim of the District's failure to implement WV's IEPs from January 2018 through the 2019-20 SYs should not have been rendered moot by WV's purported graduation and dismissed based on the presumption that there was no educational harm, such as a gross denial of FAPE.

216.    Insofar as the District had not challenged the Parent's inclusion of Section 504 violations in this complaint, the SRO erred in failing to address the Parent's assertion that her claims for compensatory services under Section 504 are not rendered moot by the absence of a "gross denial of FAPE under the IDEA" or by WV's purported graduation.    Therefore, the Parent's Section 504 claims should not have been dismissed on those grounds.

217.    The SRO and IHO were arbitrary and capricious in issuing two mutually exclusive rulings—i.e. ruling that WV was not entitled to pendency services and, at the same time, ruling that WV's pendency should be Ardsley HS in the event of an appeal.

218.    In predetermining WV's pendency placement in the event that their respective rulings are subjected to an appeal, the SRO and IHO essentially affirm WV's eligibility for pendency services but improperly refrain from ordering the District to offer prospective and compensatory services to WV or to reimburse the Parent for the costs she incurred.

### Improper Modification of Curriculum and Diploma Requirements

219.    The SRO and IHO erred in failing to find that the hearing record does not support a finding that the student met the State's requirements for a regular diploma, as stated in 8 NYCRR Part 100.5(a)(3).

220.    The SRO failed to address the Parent's contention that the hearing records fail to indicate how WV earned credits reflecting commencement level standards in CDOS and FACS, as required under 8 NYCRR Part 100.5(a)(3).

221.    The SRO erred in failing to find that the IHO improperly resorted to a summary judgment finding WV had graduated, when the hearing record cannot support an assertion that WV has met the curriculum's requirement for a diploma, insofar as the subjects of CDOS and FACS do not

appear in the student's transcript or report card, *(See PEx A p.10)* nor has the District otherwise established, for the hearing record, the method of instruction that it implements for these subjects, the minimum requirements in these subjects for the award of a diploma, how the students are assessed in that regard, and that WV's performance levels have met the minimum criteria applied to all students.

222.     The SRO erroneously equated the State diploma's requirement for achievement of commencement level CDOS learning standards to earning a CDOS commencement credential, *(See PEx A p. 12)* which is a credential distinct from a regular diploma and requires that a recipient achieve specific criteria demonstrating career readiness, as indicated in 8 NYCRR Part 100.6(b), in addition to demonstrating achievement of commencement level CDOS learning standards.

223.     The SRO erred in failing to recognize that, as stipulated in 8 NYCRR Part 100.5(a)(3), the achievement of commencement level CDOS learning standards is a requirement for a diploma for all "[s]tudents first entering grade nine in the 2008-2009 SY and thereafter" and is not restricted only to those students attempting to earn the CDOS Commencement Credential.

224.     The SRO failed to acknowledge the reference to 8 NYCRR Part 100.1(t)(2)(iii) in the Parent's Memorandum of Law for her RfR , which states, "commencement-level State learning standards and State assessments reflect the knowledge, skills, and understandings all students are expected to know and be able to do upon receiving a high school diploma" (underline added).

225.     In her finding-- that "the IDEA does not impose the additional requirement of progress on IEP goals and objectives on disabled students that is not imposed on non-disabled students in order to graduate with a regular high school diploma" *(See PEx A p. 10)*—the SRO erred in failing to recognize that non-disabled students are also required to turn in homework in a timely manner or risk failing classes required for a diploma.  Therefore, WV's IEP goals—i.e. turning in homework on time and practicing task analyses and time management strategies for turning in projects--are, in fact, functional skills included in the general curriculum objectives that even non-disabled diploma candidates must necessarily master to earn the credits required for that certificate.

226.     In holding that graduation credits and requirements generally fall under the District's discretionary authority, subject to the review of the Commissioner of Education, *(See PEx A p. 11)* the SRO erred in failing to recognize that such authority does not extend to the imposition of discriminatory learning standards when making academic decisions, for which reason, the determination of the appropriateness of curriculum modifications for students with an IEP must follow procedures and standards set by the IEP formulation process, which is the purview of the IHO and the SRO.

227.     The SRO failed to recognize that the controversies presented in this matter do not involve pure academic determinations, and that the Parent is not challenging just the award of credits or a diploma, but instead, is asserting that the discriminatory process by which such credit and diploma

<u>were awarded to WV</u> violated the IDEA and the ESEA/ESSA and denied WV the FAPE to which he was entitled and should have remained entitled.

228.    The SRO misapplied to this matter several of the cases she cited, insofar as those cases did not involve issues of <u>improper discrimination as a cause of the school's academic decisions</u> (e.g. *Appeal of K.D*,, 52 Ed Dept Rep, Dec. 16,460; *Matter of Isquith v Levitt*, 285 App. Div. 833 [2d Dep't 1955]) or they were found to be lacking evidence to support a claim of improper discrimination or such proscribed animus (e.g. *Kajoshaj v. New York City Dep't of Educ*., 543 Fed. App'x 11,17 [2d Cir. Oct. 15, 2013]).

229.    The SRO failed to note other publicly available decisions of the Commissioner of Education dismissing claims of violations under the IDEA and Section 504 (e.g. *Appeal of C.N. and C.N.,* 60 Ed Dept Rep, Decision No.17, 954  http://www.counsel.nysed.gov/Decisions/volume60/d17954 ) for lack of jurisdiction.

230.    The SRO failed to acknowledge the reference in the Parent's affidavit to the *Regents Policy Statement on Middle-Level Education, Supporting Young Adolescents July 2003*  (which may be accessed at http://www.nysed.gov/curriculum-instruction/middle-level-education-history-and-policy ), which stated the Board of Regents' position that the curricula of school districts shall ensure the <u>achievement of all 28 of the learning standards,</u> which includes those under CDOS.

231.    The SRO failed to acknowledge the reference in the Parent's affidavit to *The Middle Level Achievement Checklist* (which may be accessed at http://www.nysed.gov/curriculum-instruction/middle-level-education-achievement-checklist) – which indicates that the NYSED had provided schools 3 model strategies for the instruction in the learning standards, so as to ensure that students achieve the standards <u>even in the non-tested curriculum content</u>, such as the CDOS.

232.    In light of the multiple ways to incorporate CDOS into the curriculum, the SRO also failed to acknowledge that the District's chosen method for doing so cannot be presumed, and such information should have been included in the hearing record before that record can support the contention that WV met the requirements for a diploma that the District imposes on all its students.

233.    The SRO erred in failing to recognize the CDOS standards as a component of the State mandated "substantive curriculum" content, <u>in and of itself,</u> as reflected in her finding that "the discretionary supports provided by the district did not contravene the student's IEP" [and] "<u>did not constitute a modification of the substantive curriculum given  the student still was required to—and objectively did—master the subject matter to the extent necessary to pass the US History class and the related Regents examination."</u> (emphasis added).*(See PEx A p. 11)*

234.    By relying solely on the student's ability to "master the subject matter" of U.S. History and to pass the Regents exam as the litmus test of whether or not WV mastered the "substantive curriculum content,"  the SRO demonstrated her failure to grasp the gravamen of the Parent's complaint—i.e. the contention that functional skills comprising the CDOS learning standards, and

including the ability to turn in homework, is just as much a part of the "substantive curriculum content" as is passing the Regents exam for that subject or mastering its course content.

235.    Having failed to recognize the full scope of the general curriculum, the SRO likewise failed to recognize modifications thereof.

236.    The SRO erred in failing to recognize that, as indicated in his May 2020 progress report,  WV could not have demonstrated the required mastery of the US History subject matter if he did not turn in his homework for assessment; that unassisted and without having mastered that functional skill of turning in his work, WV would have failed a course required for a diploma; and that, therefore, WV could not have been able to earn the credits required for a diploma.

237.    The SRO erred in her misleading analysis that the discretionary supports provided by the District did not contravene his IEP nor constitute curriculum modification *(See PEx A p. 11)*, and failed to recognize that the District's interventions alone were ineffective in mobilizing WV to do his required work, and, by themselves, did not constitute the modifications alleged in the complaints.

238.    The SRO erred in failing to recognize the role played by the "extraordinary measures" that needed to be taken at home by the Parent or by WV's private counselor, Dr. Michelle Dunn, both of whom resorted  to enlisting the in-person assistance of WV's brothers with whom WV lived at the relevant time.

239.    In light of WV's homework having become a shared household responsibility instead of one which WV should have been able to manage independently, the SRO erred in failing to recognize the necessary interventions provided through the concerted efforts of the household, Dr. Dunn, and school staff as a curriculum modification that relieved WV of the burden of demonstrating the CDOS based skills expected of a graduating student.

240.    Thus, the SRO erred in failing to hold that the extensive support WV received, as a whole, did contravene WV's IEP, insofar as the IEP contained no provisions for an aide or for anyone else to share WV's responsibilities.

241.    In the alternative, the SRO should have found that WV's IEP was inadequate in light of the extraordinary support WV ended up needing, but for which his IEP failed to provide an aide.

242.    In light of the undisputed premise that, as reflected in the District's progress reports, the District's teachers assign homework and that failure to turn in homework can lead to failure to pass a required class and earn the designated course credit,  the SRO erred in failing to recognize that, at minimum, the CDOS curriculum would necessarily require a diploma recipient to turn in enough homework, independently, to earn a passing grade in a subject required for a diploma and  to prioritize those required classes when needed —a task that WV was unable to do.

243.    The SRO's finding-- that WV's need for accommodations "do not conclusively evidence that the District effectually modified curriculum requirements," *(See PEx A p. 10, note 3)*--improperly shifted the burden of proof from the District to the Parent.

244.    The SRO erred in failing to hold that it is the District—not the Parent—who bears the burden of proving that the District provided WV FAPE—a process that would require a showing of how the District instructs and assesses all its students in the CDOS learning standards; that WV achieved the minimum standards prescribed; or that, if learning standards were modified, such modified expectations constituted FAPE for WV, taking into account the need for him to make meaningful progress in light of his circumstances.

245.    While the SRO acknowledged the District's Exit Summary *(PEx A pp. 8-9),* she failed to recognize that the summary merely describes WV's present levels of performance and needs, without providing evidence that these levels meet whatever minimum requirements for CDOS or FACS  the District imposes on all its students who attempt to earn a diploma.

246.    The SRO erred in failing to recognize or acknowledge evidence of circumstances that belie the optimistic tone that the predetermined April 2020 Exit Summary attempted to convey—e.g. WV's May 2020 progress report warning of imminent failure in U.S. History class and delinquency in other subjects, or the fact that, independent of the Parent, school staff found sufficient cause for concern to deliberate on WV's need for a Covid-19 medical hardship exemption.

247.    The SRO erred in failing to consider that WV's later evident progress towards his CDOS based IEP goals in the fall of 2020—albeit with his private providers—indicated that he is capable of progressing towards the targeted goals and that, therefore, implementing curriculum modifications that allows the award of  a diploma under lowered expectations for WV would not confer meaningful progress, in light of WV's circumstances, and would constitute a denial of FAPE.

248.    The SRO failed to acknowledge and apply the Parent's asserted distinction between accommodations and modifications, in accordance with NYSED guidelines [12]—i.e. that accommodations provide support, such as extended time, that enable students to meet curriculum requirements expected of all students but do not make fundamental alterations in the content or expectations of the curriculum, whereas modifications do.

249.    The SRO erred in failing to find that, since it is uncontested that the interventions offered to the Parent—including the Covid 19 Medical Hardship Exemption-- were supposed to be accommodations *(PEx A pp. 9-10)* and not modifications, WV's "final" grade of C+ in U.S. History reflected that accommodation and did not waive WV's right to retain access to free public education until he reaches the age of 21 or until he achieves the still remaining requirement of that

---

[12] *New York State's Continuum of Special Education Services for School- Age Students with Disabilities: Question and Answers*  can be accessed at http://www.p12.nysed.gov/specialed/publications/policy/documents/continuum-schoolage-revNov13.pdf

course--i.e. that he demonstrate the mastery of the commencement level learning standards in CDOS, as it pertains to turning in homework.

250.    The SRO erred in failing to find that, without eventual evidence that WV did meet the CDOS based expectations imposed on all students for the award of a diploma, the District's issuance to WV of that document necessitated a curriculum modification that was not determined to be appropriate for WV by a CSE, including the Parent, nor indicated in his IEP, thereby constituting a violation of the IDEA,  and a denial of FAPE.

### **Predetermination of WV's Graduation as a Gross Violation of the IDEA**

251.    The SRO failed to address the Parent's contention that the District implemented curriculum modifications, without which WV could not have received a diploma, and that doing so without a CSE meeting and an IEP revision constituted a denial of the parental participation in that decision making process and a denial of FAPE.

252.    The SRO failed to address the Parent's uncontested assertion that the District failed to convene a CSE meeting to address the appropriateness of WV's graduation, notwithstanding the multiple indications for doing so.

253.    The SRO failed to address the Parent's assertions that the IHO failed to find that the District violated the IDEA when it denied her request for a CSE meeting in light of WV's deteriorating functioning and her concern that termination of IEP services may not be appropriate.

254.    The SRO failed to address the Parent's assertion that the IHO erred in failing to find that the District violated the IDEA by insisting on an IEP amendment without a CSE meeting and failing to convene the said CSE meeting in light of disagreements regarding the exact content and nature of accommodations to be added to WV's IEP.

255.    The SRO failed to address the Parent's assertion that IHO erred in failing to find that the District violated the IDEA when it failed to convene a CSE for a mandatory annual review pursuant to 8 NYCRR Part 200.4(f).

256.    The SRO failed to address the Parent's assertion that the IHO erred in failing to find that the District's holding an Exit Summary Meeting, instead of the Annual Review mandated under 8 NYCRR Part 200.4(f), constituted predetermination of the student's change in placement by graduation, a denial in the Parent's participation in that decision-making process, a violation of the IDEA, and a denial of FAPE.

257.    The SRO failed to address the Parent's assertion that the IHO erred in failing to find that District's persistent refusal to offer a pendency placement to WV evinced the District's predetermination that WV's eligibility for IDEA services will terminate through graduation in June

2020, and a closedmindedness in its decision-making that cannot be swayed, even by the automatic injunction inherent in the IDEA's pendency provision.

258.    The SRO failed to address the Parent's assertion that the IHO erred in failing to find that the District violated the IDEA by foregoing a CSE meeting to discuss WV's evident regression in functioning, and by, instead, resorting to a discussion only amongst school staff –i.e. Asst. Superintendent for Special Education Jeanne Farruggio, Principal Danielle Trippodo, and the Child Study team—to which event <u>the Parent was not invited</u>.

259.    The SRO failed to address the Parent's assertion that the IHO erred in failing to hold that the full implications of the Covid-19 medical hardship exemption should have been discussed in a CSE meeting and incorporated in WV's IEP.

260.    The SRO and IHO erred in failing to find that the District's issue to WV of a diploma without convening a CSE meeting beforehand--notwithstanding the Parent's requests to discuss the possible delay of WV's diploma and the school staff's own recognition of WV's need for additional interventions such as the Covid-19 medical hardship exemption--constituted a denial of the parental participation in the decision regarding WV's placement for the 2020-21 SY and every school year thereafter, until he turned 21 years of age.

261.    Thus, the SRO erred in failing to hold that the District subjected WV to a gross violation of the IDEA and denial of FAPE, warranting compensatory services.

262.    The SRO erred in failing to hold that, in light of the District's denial of FAPE, the Parent's private program was an appropriate alternative educational placement for the 2020-21 SY, insofar as the services were chosen specifically for the purpose of addressing WV's manifested needs for developing organizational and time management skills and for adapting to a remote learning model, which then appeared to be the predominant mode of instruction for the foreseeable future, in light of the pandemic.

263.    The SRO erred in failing to find that the Parent treated the District equitably in that she gave at least 10 days notice prior to implementing the private program.

264.    The SRO erred in failing to declare the Parent's private program as WV's new placement and to order the District to reimburse the Parent for the costs she had incurred thus far.

265.    Regarding the issues that were raised in the complaints, but for which the parties were given no opportunity to argue or present evidence, the SRO erred in failing to either request additional evidence and arguments so she may render a decision, or remand the issues back to an IHO for a proper hearing.

**<u>Pendency</u>**

266.    The SRO and IHO erred in failing to  recognize that, where a student's  eligibility for pendency services is in question, by reason of that student having purportedly graduated,  the factor determining eligibility is whether or not the complaint <u>challenged</u> that graduation —as the Parent did in this matter-- and that, <u>regardless of the merits of the complaint,</u>  the student remains entitled to pendency services for the duration of the proceedings, until a final decision has been reached on the issue of graduation.

267.    The SRO and the IHO erred in failing to find that WV should have been offered pendency services from the start of the 2020-21 SY until a final decision on the appropriateness of his graduation was rendered, and that, <u>in light of the District's refusal to offer pendency services,</u> the Parent should have been reimbursed for the costs she incurred in providing interim services.

268.    The SRO and IHO erred in failing to recognize and hold that the District's graduation of WV, on June 24, 2020, and its subsequent failure to offer a pendency placement for the duration of the procedures, in light of the Parent having invoked pendency <u>prior to graduation,</u> constituted a violation of the IDEA's pendency provisions.

269.    The SRO and IHO improperly found that the Parent <u>unilaterally</u> changed WV's pendency placement when <u>it was the District who first changed his placement</u> by graduating him after the Parent invoked pendency,  then by failing to offer services from the start of the 2020-21 SY year until the present day,  thus leaving the Parent  no alternative but to seek other sources of services.

270.    To the extent that the SRO may have relied on her observation that "none of the subsequent due process complaint notices requested that the district implement pendency in the district high school based upon the November 2019 IEP" the SRO failed to recognize that pendency is regarded as an automatic injunction triggered by the filing of a complaint, which need not be specifically mentioned in the complaint, but which issue the District was, nevertheless,  already given notice by the original complaint.

271.    The SRO and IHO erred in designating a <u>specific school,</u> instead of a general level and type of services, as WV's pendency placement.

272.    The SRO and IHO erred in failing to hold that the IDEA allows for a change in the location or the provider of IEP services without such change constituting a change in the overall placement, and that the Parent's <u>request</u> for the District or the IHO to <u>consider</u> a change in providers was not in violation of the IDEA's pendency provisions or a rejection of the placement as a whole.

273.    The SRO and IHO improperly relied on the court's decision in *Ventura de Paulino*, 959 F. 3d at 534, notwithstanding that court's own clarification of its ruling-- that the Parent cannot unilaterally change a student's pendency placement-- <u>does not consider or resolve circumstances wherein the former placement was unavailable and the District refuses or fails to provide pendency placement.</u>

274.     The SRO and IHO erred in failing to recognize that  WV's purported graduation and the District's own refusal to offer WV any pendency services thereafter, while erroneous, have nevertheless rendered that former placement unavailable to WV, thus leaving the Parent no option but to seek other providers of services.

275.     In light of the inapplicability of the *Ventura* court's decision to this matter-- wherein the District initially terminated the pendency placement, acknowledged during the October 9, 2020 pre-hearing conference that a return to Ardsley HS may not be appropriate to WV's grade level, then failed to offer a replacement pendency placement--the SRO and IHO erred in failing to apply other caselaw that did allow the Parent to secure a private placement when the District refused to provide pendency services (e.g. *T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 159 (2d Cir. 2014)).

276.     The SRO erred in failing to find that, in light of the District's counsel's knowledge of the automatic injunction inherent in the IDEA's pendency provision and of the Parent's prior notice of her intent to secure private placement, the District's discharge of WV from Ardsley HS and its persistent failure to offer WV pendency services thereafter constituted the District's implicit agreement to the change of location of the pendency services or to one that befits WV's circumstances and grade level, in light of WV's advancement in curriculum areas other than CDOS.

277.     To the extent that WV's discharge from Ardsley HS may be deemed to constitute agreement only to a change in location of pendency services, the SRO and IHO erred in failing to hold that the private services the Parent obtained for WV should, nevertheless,  be deemed to constitute WV's pendency placement in light of its substantial similarity to the general education setting with related services that constituted WV's placement at Ardsley HS.

278.     The SRO's  holding *(See PEx A p. 15)*-- that pendency "would potentially be available to the student … in the event there are further developments that result in this matter continuing in some other forum"—essentially affirmed  that WV is eligible for pendency during the course of the procedures, but the SRO improperly failed to order the District to  offer compensation for the missed pendency services to which WV had been entitled since the beginning of the 2020-21 SY.

279.     The SRO erred in acknowledging the District's misleading allegation that the Parent "declined" services when no offer for pendency services was ever given and such allegation was not supported by the hearing record.

280.     The SRO erred in finding that, during the pre-hearing conference, the District was willing to discuss providing pendency services when, at the time, the District's counsel had been speaking of compensatory services as part of a resolution agreement, not a pendency placement.

281.     The SRO erred in failing to find that, even if  the District's counsel seemed "willing to discuss implementing pendency services … at the District's high school, but was confused," *(See PEx A p.*

*15)* such confusion did not excuse the District from its obligation, under an automatic injunction, to, nevertheless, offer pendency services--which offer the District ultimately never made.

282.    Furthermore, the SRO erred in failing to hold that if the District was confused about the appropriateness of WV's return to Ardsley HS--in light of WV's advancement in areas of the curriculum other than CDOS-- it should have found and offered a pendency placement other than Ardsley HS, in light of evidence in the hearing record that the school's staff was unable to implement WV's IEP anyways.

283.    The SRO erred in failing to hold that the District forfeited its prerogative to choose WV's placement in light of its demonstrated bad faith and gross misjudgment in managing WV's placement—e.g. its predetermination of WV's graduation, it's refusal to comply with an automatic injunction, then its insistence that WV's placement was <u>in-person</u> instruction, notwithstanding the pandemic's requirement that nearly all other students attend remote instruction and the District's knowledge of the risk of serious illness for WV due to his immunocompromised status.

284.    The SRO and IHO erred in failing to find that, in light of the expansive course options available through the Ardsley HS general curriculum—including independent studies for elective courses, college classes for dual credit or enrollment in specific dual enrollment programs, online courses, internship experiences, career and technical education, among others—the Parent's private program was substantially similar to options available through WV's pendency placement in Ardsley HS.

285.    The SRO and IHO erred in failing to find that, in light of remote and hybrid instruction having been authorized as an alternative mode of instructional delivery for the general school population, the services provided by the Parent's private program to replace the IEP services, was substantially similar to the services that Ardsley HS would have made available to WV, with the exception that the private providers were actually capable of engaging WV in the act of maintaining his planner.

286.    In light of the District's continued failure to offer pendency services, the SRO erred in failing to agree with the Parent's placement and to order reimbursement for the costs the Parent had incurred thus far.

## Claims Pertaining to the Second Semester of the 2017-18 SY

287.     The SRO should have found that the claims based on events that occurred during the second semester of the 2017-18 SY were within the statute of limitations and, to that extent, WV should be eligible for the award of compensatory services to bring the him to the level of functioning he would have attained had he received FAPE.

288.    The SRO should have adjudicated and ruled on the issue of the date to be used for the determination of the complaint's date of submission—i.e. the date the complaint was mailed by the Parent or the date the complaint was received by the District.

289.    The SRO should have found that *res judicata* and *collateral estoppel* do not apply to this complaint insofar as the two complaints pertained to two different IEPs (one for each semester of the 2017-18 SY) and to a different school for each semester  (Karafin School and Ardsley HS).

290.    The SRO should have found that the IDEA does not preclude the filing of <u>different</u> claims even if the issues or events pertained to the same school year.

### Count II
### Request for Appropriate Relief
### IDEA 20 U.S.C. 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3)
(The Parent and WV against the Ardsley UFSD)

#### Request for Reimbursement For Lost Pendency Services (20 U.S.C. 1415(j))

291.    Parents restate the preceding paragraphs as if set forth in full herein.

292.    Pursuant to the pendency provision of the IDEA, WV was entitled to the continued provision of services under the IDEA upon the filing of a due process complaint on June 4, 2020 and for the duration of the procedures.

293.    Insofar as, in that complaint,  the Parent challenged the District's award of a diploma to WV, he should have remained eligible for pendency services for the duration of the procedures, while the validity of his diploma remained in question.

294.    The District violated WV's pendency placement by discharging WV from Ardsley HS through his graduation on June 24, 2020--after the Parent had invoked pendency in her June 4, 2020 due process complaint—and then by failing to offer any pendency placement for the 2020-21 SY, notwithstanding the Parent having challenged the appropriateness of the District's award to WV of a diploma.

295.    The Parent's filing of a due process complaint or an appeal of an administrative decision that contested WV's graduation triggered an automatic injunction that imposed upon the District the affirmative duty to make an offer of a pendency placement, which offer the District never made, as it consistently maintained that WV was ineligible for services.

296.    In light of the automatic injunction inherent in the pendency clause of the IDEA, the District's discharge of WV from his prior placement and its consequent refusal to offer him placement thereafter,  should be deemed to constitute an implicit agreement to the Parent's providing the placement while awaiting a final judgment on the appropriateness of his graduation.

297.    In the alternative, the District's failure to provide a placement should be deemed to constitute an abrogation of its prerogative to choose the location for the provision of the pendency services.

298.    Insofar as the Parent's program provided services and courses that are substantially similar to the services and course options available to WV in his prior placement, the Parent's alternative education placement should have been deemed to be WV's new pendency placement for 2020-21 SY and the remaining duration of the procedures.

299.    To compensate the Parent for funding services at a time when WV should have been offered pendency services, it is respectfully submitted that the Parent should be awarded reimbursement for the costs she has incurred, thus far, for WV's privately funded services.

300.    Insofar as substantial similarity does not require the exact same services as WV's pendency placement, and that other factors--such as the Parent's financial constraints and WV's medical problems--precluded the Parent from providing all hours and nature of services provided in WV's prior pendency placement, the Parent requests an award of compensatory services in the form of funding for other constitutents of WV's pendency placement that the Parent was unable to provide due to such confounding factors.

**Request for Remedy for the District's Gross Violation of the IDEA Through Predetermination of WV's Graduation**

301.    Notwithstanding the absence of a hearing, the District was given the opportunity, during the exchange of motions and the SRO's review, to contest the Parent's allegations that, prior to WV's graduation, the District improperly failed to convene a CSE meeting to review WV's IEP and determine his placement for the following year:

- pursuant to the Parent's request for one to address her request for an accommodation in the form of extended time to enable WV to meet curriculum the goals of his educational program prior to graduation;
- pursuant to the mandate under 8 NYCRR Part 200.4(f) to convene an Annual Review for the review of WV's progress towards his then current IEP goals and to formulate the following year's IEP, should an IEP continue to be deemed appropriate;
- and pursuant to WV's <u>evident need for one</u> in light of the deterioration in his functioning that prompted school staff to consider giving him the Covid 19 Medical Hardship Exemption.

302.    It is clearly evident that, instead of convening a CSE meeting, Asst. Superintendent for Special Education Jeanne Farruggio participated in a discussion regarding WV with Principal Trippodo and the Child Study Team-- a conversation to which the Parent was not invited.

303.    Principal Trippodo's email to the Parent indicates that the Parent was informed of the discussion between Principal Trippodo, Ms. Farruggio, and the Child Study Team only after the team had already made the decision to offer the Parent the single option for a course of actiont— the Covid 19 Medical Hardship Exemption.

304.    Unlike a CSE meeting and the procedural safeguards required for such a meeting, the email exchange with Principal Trippodo did not allow the Parent to be privy to other information shared amongst the school staff--including relevant observations made by WV's teachers and any other implications inherent in the Covid-19 exemption--or to other options considered for WV.

305.    Furthermore, the email did not indicate to what extent, if any, Ms. Farruggio shared with Principal Trippodo and the Child Study Team the Parent's prior requests for specific accommodations, particularly the possibility of extending WV's eligibility for IEP services past his scheduled graduation in June 2020.

306.    However, it is undisputed that the District's offers to WV consisted only of <u>accommodations</u> and not curriculum modifications.

307.    Insofar as accommodations are not intended to effectuate fundamental alterations in the educational program intended for all students, and should have served only to mitigate damage and provide the support WV needed to enable him to <u>eventually</u> meet the curriculum requirements that he was unable to meet by June 2020, the Parent's agreement to the accommodations did not also entail an agreement for the District to terminate WV's eligibility for free public education and FAPE prior to his having demonstrated that he met all curriculum requirements for a diploma.

308.    The District's failure to offer the Parent the opportunity to fully discuss the District's plan for WV in a CSE meeting deprived the Parent of the opportunity to clarify such distinction between accommodations and curriculum modifications.

309.    The District failed to allow the Parent the opportunity to present to other school staff her concern regarding WV's inability to meet the goals of his IEP and her request to delay the issuance of WV's diploma to enable him to meet the requirements of his educational program, which included the demonstration of commencement level CDOS learning standards.

310.    By failing to grant the Parent audience with a CSE to share her own concerns regarding WV's graduation in June 2020, to hear the observations and concerns of other school staff that prompted the offer of a Covid-19 medical hardship exemption,  and to discuss other options available for WV,  Ms. Farruggio and the District predetermined the permanent termination of WV's right to FAPE in June 2020 and rendered the Parent unable to determine the appropriateness of that change in WV's educational placement.

311.    The failure to convene a CSE is made even more egregious in light of the Covid-19 pandemic necessitating a change to remote instruction for most, if not all, educational institutions, of WV's evident failure to adapt to remote instruction, and of the uncertainty, then, regarding the course of the pandemic and the continued need for remote instruction in the years to come.

312.    By failing to convene a CSE meeting prior to WV's graduation in June 2020, the District denied the Parent participation in that ultimate decision-making process regarding WV's permanent placement for the subsequent school years for which WV could have been eligible for FAPE—i.e. the 2020-21, 2021-22, and 2022-23 SYs until he turned 21 years old.

313.    The District's insistence on discharging WV and eliminating academic supports while he was evidently experiencing academic hardship and demonstrating regression constituted a gross denial of FAPE insofar as it placed him in an inappropriate predetermined placement for a substantial period of time.

314.    In light of the District's gross violation of the IDEA for the remaining school years for which WV could have remained eligible for FAPE, until WV turned 21 years of age, the Parent's resorting to placement in a private program was appropriate for the 2020-21 SY and thereafter.

315.    The Parent's program of counseling and special instruction/coaching, utilizing a hybrid model of remote and in-person instruction, provided WV FAPE insofar as it was specifically created to address WV's specific weaknesses in time management and organization, and his failure to adapt to remote instruction, which served as the predominant model of instruction for the then foreseeable future at the time of the Covid 19 pandemic.

316.    Thus, in combination with college level classes commensurate with WV's academic strengths, the Parent's program provided services and support specially designed to enable WV to benefit from instruction and make progress in the general curriculum by meeting WV's unique needs.

317.    The administrative record supports the Parent's assertion that, more than 10 days prior to implementing her privately funded program, the Parent notified the District of her intent to implement the program in the event that the District fails to offer services, and her intent to seek reimbursement from the District.

318.    Thus, the Parent's conduct towards the District was equitable insofar as she provided the District a description of the programs she intended to implement and an opportunity to offer an alternative placement.

319.    The Parent's alternative education placement meets the Burlington-Carter criteria for an appropriate new unilateral private placement for the 2020-21 SY—i.e. that the District denied WV FAPE; that the Parent's placement was appropriate; and that the Parent's treated the District equitably.

320.    Therefore, the Parent respectfully requests from this court an order for appropriate equitable relief in the form of reimbursement for the costs she incurred in implementing the program for the 2020-21 SY.

321.    To the extent that the Parent had also notified the District of her intent to place WV in a summer program—Focus Collegiate--the Parent also respectfully requests reimbursement for the costs of that program, in light of the District's failure to address WV's demonstrated regression through an ESY program.

322.    In the event that the question of WV's diploma and other issues raised in the complaint are remanded back to the administrative forum for adjudication, and it is deemed that WV remains eligible for pendency, the Parent requests that WV's private counseling and coaching services be

designated as WV's new pendency placement to be accessed upon his enrollment in courses appropriate to his academic strengths.

323.     Insofar as the District subjected WV to a gross violation of the IDEA, the Parent respectfully requests from this honorable court a declaration that WV is eligible for compensatory services, and an order for the District to prospectively fund compensatory services which WV can access upon his enrollment in courses appropriate to his academic level, until he can independently demonstrate the CDOS based functional skills he needed to have mastered upon the receipt of a diploma.

324.     In light of WV's underlying medical conditions and the uncertainty regarding the appropriate mode of delivery of instruction in the foreseeable future, due to the Covid-19 pandemic, the Parent requests, as appropriate and equitable relief, that WV should be allowed the flexibility of availing of hybrid or remotely delivered instruction as an alternative to in-person instruction if or when it is appropriate to do so.

## Request for Remedy for the District's Failure to Create an Appropriate Transition Plan

325.     In light of the Covid 19 pandemic and WV's evident failure to adapt to remote instruction, it was evident that the pre-existing transition plan geared towards WV's attendance in college the following school year was not likely to be successful.

326.     As discussed during the Exit Summary Meeting, in light of the pandemic and the very limited number of ways to control the spread of infection and the absence of a vaccine, not to mention WV's compromised immune system, it was evident at the time nearing WV's scheduled graduation that remote instruction may be the predominant mode of instruction appropriate for WV for the then foreseeable future.

327.     Notwithstanding the Parent having informed the Exit Summary meeting members of WV's circumstances and the family's willingness and conviction that WV will require a gap year prior to matriculation in college, the District failed to offer an extension of time for WV to remain eligible for public education for the purpose of remediating his deficient skills and becoming more accustomed to remote instruction.

328.     There were options available to WV within the scope of the curriculum, other than a regular diploma, that would have allowed him to continue to make progress in both the areas of his weaknesses and his strengths while continuing to access public education and IEP services.  These included the award of a high school equivalency (HSE) diploma instead of a regular diploma while WV continued studies in the Parent's private program as homeschooling, or an alternate education setting, or dual enrollment through the high school.

329.     The District's failure to extend WV's eligibility for services and to create an appropriate transition plan that addressed WV's individual circumstances constituted a denial of FAPE, for which the Parent requests compensatory services.

330.     To the extent that WV's private services address career exploration to allow WV to discover other motivators that can serve as a basis for an effective BIP, in accordance with the

recommendations of the BCBA, the Parent also seeks reimbursement and prospective funding for WV's private services on this basis.

### Request for Remedy for the District's Failure to Create and Follow the BIP

331.    As indicated in WV's IEPs since the November 2017 CSE meeting—which served as pendency IEPs pursuant to the September 2017 due process complaint-- WV's autism required the implementation of a BIP to address behaviors that impeded his learning.

332.    These behaviors included those that impeded the delivery of special instruction in Resource Room and, consequently, the achievement of his Resource Room and counseling goals, specifically those goals directed towards his turning in homework on a timely and regular basis and towards developing other self-management skills.

333.    The District failed to perform the FBA necessary to create an effective BIP, as indicated in WV's November 2017 IEP for implementation starting January 2018, and his June 2018, and June 2019 IEPs.

334.    Insofar as the September 2019 BCBA evaluation eventually served as a FBA, the District failed to follow the BCBA's recommendations to link WV's required tasks to his intrinsic motivations.  Instead of including in the BIP the BCBA's plan to support and direct WV to increase his motivation for tasks he deemed undesirable, the District replaced that recommendation with the provision that WV "will face  natural consequences associated with not completing assignments."

335.    The District's award to WV of a regular diploma, notwithstanding his failure to demonstrate achievement of the CDOS learning standards required to earn a diploma, constitute a failure to follow the provision in WV's BIP that he will "face natural consequences associated with not completing assignments."

336.    To the extent that WV had not yet reached the age of 21, that WV showed regression warranting the Covid 19 medical hardship exemption, and that the Parent had indicated, during the April 2020 Exit Summary meeting, that William needed a gap year prior to college, the District could have complied with WV's BIP by extending his eligibility for FAPE through ESY services or the continuation of eligibility for services for another year.

337.    To the extent that there was an interim option available—a HSE diploma-- that did not require achievement of all State learning standards and which would have allowed WV to continue to remain eligible for a FAPE while also allowing him to move forward academically in his areas of strength,  the District could have complied with WV's BIP in a reasonable and non-punitive manner that validly reflected and rewarded WV's other achievements.

338.    The District failed to update WV's FBA-BIP in light of the January 2020 BIP having been rendered unimplementable during the pandemic in the setting of remote instruction and of WV's demonstrated failure to achieve the targeted outcomes of both his regular and special education programs.

339.     Contrary to the District's assertion that WV did not need a new FBA-BIP in light of the accommodations offered during the pandemic, an effective BIP did remain necessary insofar as <u>accommodations</u> did not eliminate the requirement for WV to achieve the targeted outcomes of his educational program, but instead provided WV extra time or other means of doing so than originally contemplated.

340.     The District's non-compliance with the BIP as well as its failure to discuss other options available to WV for the June 2020 graduation, in lieu of a Regents diploma, denied the Parent participation in the decision to have WV graduate in June 2020.

341.     I addition to improperly terminating WV's access to future FAPE, a diploma that was guaranteed regardless of WV's performance, removed a potential intrinsic motivator for WV to fulfill his then current IEP goals, contributed to WV's failure to achieve those IEP goals, and contributed to the District's failure to implement WV's pendency IEPs for the 2019-20 SY.

342.     The Parent respectfully requests funding for compensatory services for the District's failure to properly implement WV's pendency IEPs.

### Count III
### Deprivation of Rights and Procedural  Safeguards Secured by the IDEA
### by Persons Acting Under the Color of Law
### (42 U.S.C. §1983; IDEA 20 U.S.C. § 1415)
(Parent against the Ardsley UFSD and Jeanne Farruggio)

343.     The Parent restate the preceding paragraphs as if set forth in full herein.

344.     Jeanne Farruggio, the District's Asst. Superintendent for Pupil Personnel Services and Special Education, has been the Head of Special Education services since 2007 and  is responsible "for establishing administrative practices and procedures for training all District personnel responsible for carrying out the provisions of Part 200 of the Commissioner's Regulations as well as members of the Committee on Special Education."   Ms. Farruggio has also authored  the District Policies and Procedures for Assuring Appropriate Educational Services and Due Process in Evaluation and Placement of Students With Disabilities.  Thus, she may be recognized as one whose edicts or acts may fairly be said to represent the District's official policies regarding special education.

345.     While some of Ms. Farruggio's individual practices are not necessarily rooted in official written policies, they nevertheless shape the customs and practices of District personnel and, therefore, carry the weight of official policies in the area of special education.

346.     The Parent's rights to procedural safeguards secured by the IDEA are clearly established rights of which the District and Ms. Farruggio, in her individual and official capacity, should have known.

347.     The Parent's rights to avail of pendency services for WV is a clearly established right secured by the IDEA of which the District and Ms. Farruggio should have known.

348.    The District and Ms. Farruggio, in her individual and official capacities, while acting under the color of law, deprived the Parent of her rights to the procedural safeguards under the IDEA by ignoring the automatic injunction inherent in the IDEA's pendency clause, and allowing the issue to WV a diploma, notwithstanding the Parent having filed a due process complaint challenging the appropriateness of a diploma and her having invoked pendency prior to WV's graduation.

349.    After causing WV to graduate, in reckless disregard of the automatic injunction for the student to remain in his then current placement, the District then argued that WV was ineligible for any services under the IDEA, including pendency and compensatory services, on the grounds of his having graduated.

350.    As a result of the District's issuance to WV of a diploma, which was deemed to be an indication of the provision of FAPE, the IHO dismissed the Parent's complaint in its entirety on the grounds of mootness.

351.    On the other hand, the SRO held that the impartial hearing is not the proper forum for disputes involving a district's decision to award course credits or issue a diploma.

352.    However, in light of the Parent's challenge to the diploma being rooted in the assertion that the District relied on disability based discriminatory standards, and such disability based discrimination being outside the jurisdiction of the Commissioner of Education, it would be futile for the Parent to request the Commissioner to rescind the diploma without first establishing that disability based discrimination did, in fact, occur.

353.    Thus, the Parent was denied the benefits of the IDEA's administrative proceedings by the District's refusal to comply with the IDEA's pendency provisions and its issuance to WV of a diploma prior to the Parent's challenge to WV's graduation having being addressed and settled.

354.    Thus, the District and Ms. Farruggio deprived the Parent of the IDEA's procedural safeguards in reckless disregard of her rights.

## Other Injuries Sustained

355.    The District caused the Parent the loss of her right to adjudication of all her other claims in both the September 2020 amended complaint and the November 2020 second complaint, and the loss of the remedies she sought—e.g. compensatory services for denial of both FAPE and pendency services for the relevant school years and reimbursement for privately funded services.

356.    In so doing, the District also caused the Parent other injuries insofar as it deprived her of prospective educational services for WV; infringed in her interests in WV's continued education and in the timely remediation of WV's educational deficits prior to his matriculation in college; shifted to the Parent the burden and inconveniences inherent in having to find or create and privately fund remedial services; caused the Parent to experience the foreseeable emotional distress, anger, desperation, hopelessness, sleeplessness, and anxieties that are inherent in being put in the position of having to compensate for the District's delinquencies and to mitigate the damage to one's child resulting therefrom.

**Count IV**
**Association Discrimination**
**§504 of the Rehabilitation Act of 1973; Title II of the Americans with Disabilities Act**
(The Parent against the  District)

**Discrimination against WV**

357.    Petitioners restate the preceding paragraphs as if set forth in full herein.

358.    The District is a recipient of federal funds and, as such, is tasked with providing students FAPE pursuant to Section 504 of the RA and for enforcing the non-discrimination and anti-retaliatory clauses of the RA and the ADA.

359.    The District holds high expectations for its students, as reflected in the self-declared "Mission Statement" introducing the Board of Education's policy manual:

"The Ardsley School District aims to maximize every student's potential by providing an educational environment in which learning is paramount, students are active participants, and the quality of teaching reflects the high expectations of the community. We seek to help young people attain the highest level of cognitive growth and critical analysis in all disciplines and we seek to instill a love for and appreciation of aesthetics and the environment in which we live in order to help students succeed in a world of rapid change, growing competition and cultural diversity. We strive to build a lasting appreciation of democratic values, which includes a respect for others, a commitment to service to one's community, and a strong sense of self-esteem - all of which are fundamentals of physical, social and emotional well-being. The District values the appropriate sharing of responsibilities in making decisions and encourages the broadest participation of parents, community members, staff and students."

360.     WV is a qualified individual with disabilities under Section 504 of the RA and the ADA by virtue of having autism, ADHD, emotional disturbance, obstructive sleep apnea, Crohns Disease, chronic kidney disease, an immunocompromised status due to medications that suppress his immune system, and by having a history of being a recipient of services through an IEP and Section 504 accommodation plans.

361.    WV is substantially limited in the major life activities of effective communication, social skills, independent self-management in meeting curriculum requirements such as turning in homework, sleeping, digestion, metabolic waste elimination through the kidneys, and immunity from infection.

362.    The District knew of WV's disabilities.

363.    The District subjected WV to discrimination, based on his disabilities, and with deliberate indifference to his rights, as set forth below.

364.    In New York State, residents remain eligible for a free public education until the age of 21 or upon the receipt of a regular diploma signifying that the student has met the requirements stated in 8 NYCRR 100.5(a), which include the achievement of commencement level State learning standards that include CDOS.

365.    WV was excluded from full participation in the District's services, programs, or activities, or was otherwise discriminated against by the District on the basis of his disabilities, when the District terminated his eligibility for free public education and services prior to his having demonstrated achievement of the commencement level learning standards—e.g. the functional skill of habitually submitting adequate homework for grading—that all students are expected to perform as a required task for earning credits towards a regular high school diploma.

366.    Due to WV's disabilities, the District subjected him to lower curriculum standards, in the area of CDOS, than it would have normally required of the general non-disabled population of students to whom apply the diploma requirements under 8 NYCRR 100.5(a)(3).

367.    Insofar as the reasons for WV's inability to demonstrate such necessary functional skills was rooted in his autism and other disabilities, and that the District failed to implement the special instruction and the accommodations he needed—e.g. a BIP-- to learn and habitually demonstrate the functional skills expected of nondisabled students, the District failed to meet WV's needs as adequately as the needs of nondisabled students are met, and, thus denied WV FAPE under Section 504 of the RA.

368.    The District failed to apply to WV its self-declared mission to, among others, "maximize every student's potential…[and] to help young people attain the highest level of cognitive growth and critical analysis in all disciplines."

369.    The District violated Section 504 of the RA and Title II of the ADA by failing to regard WV's limitation in CDOS based functional skills--the area of the curriculum most adversely impacted by WV's disabilities--with the level of attention to progress monitoring that the District devotes to other curriculum content, notwithstanding the State's requirement for mastery in all of the 28 learning standards, including those pertaining to CDOS.

370.    By implementing a grading system that allows WV's strengths in mastering other subject matter to obscure the weaknesses inherent in his disabilities, the District turned a blind eye to WV's disability based needs.

371.    By failing to specifically require, in its high school report cards and transcripts, that teachers report on students' performance in the CDOS in the same way it requires reports of performance in other subjects, the District perpetuated the misconception that WV's deficiencies in functional skills are non-academic, notwithstanding the existence of specific CDOS learning standards that indicate that instruction and mastery of the subject matter is required by the State, much like other graded subjects.

372.    Insofar as the Parent's 2019 federal complaint on behalf of WV included the same claim pertaining to the District's failure to specifically require, in the District's high school report cards,

an indication of the student's progress towards CDOS learning standards, the District's failure to change its policies and practice evinces the District's deliberate indifference to the adverse effect of such a practice on WV.

373.    Although the District offered the Covid 19 medical hardship exemption as an <u>accommodation</u> intended to preserve WV's grades, its ultimate implementation as a basis for having WV exit high school without having achieved the functional skills expected of all students, rendered the purported "accommodation" to be an <u>unreasonable</u> one under Section 504/ADA insofar as it effectuated a <u>fundamental alteration of the educational program</u> and the outcomes expected from all diploma recipients.

374.    Notwithstanding the Parent's calling the District's attention to WV's persistent deficits in the CDOS learning standards expected of all students, and her request for a reasonable accommodation in the form of an extension of time prior to the award of his diploma, so he can achieve those same standards, the District issued to WV a diploma anyways. Thus, the District demonstrated its bad faith and gross misjudgment in the management of WV's educational program and its deliberate indifference to WV's rights to be subjected to the same standards as the District's nondisabled students.

375.    Notwithstanding the Parent calling the District's attention to WV's persistent deficits in the CDOS learning standards and the <u>availability of options</u> by which the District could have continued to provide WV interventions to remediate his deficits through an IEP—e.g. either as a homeschooled student or through the interim award of a HSE diploma, neither of which would terminate his eligibility for FAPE—the District terminated his eligibility for public education anyways, thus demonstrating the District's <u>deliberate indifference</u> to WV's rights to retain, until he reached the age of 21, free access to the education needed to achieve the same standards as nondisabled students.

376.    Notwithstanding the Parent having challenged the appropriateness of issuing WV a diploma and having invoked his rights to pendency, which triggered an automatic injunction for WV to receive continued services, the District terminated all of WV's services anyways, thus demonstrating its bad faith and gross misjudgment in the management of WV's educational program.

377.    The District then asserted that, in the event that WV is deemed eligible for pendency services, his pendency placement consisted of <u>in-person</u> instruction in Ardsley HS, notwithstanding the District's continued provision to its other nondisabled students of remote and hybrid instruction as accepted alternate modes of instruction.

378.    Inasmuch as WV's pendency status is rooted in his disability, and based on that pendency status, the District refused to offer WV the same option for remote instruction that it offered to non-disabled students in that same general education setting, the District discriminated against WV based on his disability.

379.    Insofar as the District offered remote or hybrid instruction to its general student population as safety measures designed to prevent transmission of the Covid 19 virus to the students, the

District's refusal to extend to WV the same options, as part of his pendency placement, constituted deliberate indifference to WV's rights to the same protective measures provided to nondisabled students.

380.    In light of the District's knowledge of WV's underlying medical conditions and immunocompromised health status--which, by the time of the pandemic, were commonly recognized as conditions that placed an individual at an increased risk of serious illness from a Covid 19 infection-- the District's insistence that WV's pendency services take the form of in-person instruction, when remote instruction was made available to other students, constitutes bad faith and gross misjudgment in its management of WV's educational program.

### **Injuries sustained by the Parent, independent of WV's injuries, as a result of the District's discrimination against WV**

381.    By prematurely terminating WV's access to free public education, based on his disability, the District deprived the Parent of the full return of the investment she made, as a parent, in choosing to reside in the school district, and of her personal interest in her child's access to the educational program provided by the District to the children of its other residents, in light of its self-declared mission to "maximize every student's potential."

382.    To compensate for the District's inadequate implementation of WV's intended program, its early termination of WV's access to FAPE, and its deliberate indifference to its obligation to adequately meet WV's needs as adequately as the needs of nondisabled students are met, the Parent had to bear the burden and inconvenience of seeking or creating alternative or supplemental services for WV.

383.    To compensate for the District's failure to provide WV the services and education to which he was entitled, the Parent had to divert to the funding of WV's education the financial resources intended for other needs of the family.

384.    By denying WV the continued special education that he needed to develop the adequate self-management skills to carry a full college course load, the District deprived WV of the opportunity to avail of the scholarship he was offered, as well as many other similar college scholarships of similar magnitude to that which he was offered.

385.    While the Parent maintains that the District did not offer pendency services, insofar as the briefs submitted by the District implied that it may have done so, the District's differential treatment of WV-- through its insistence that pendency services consisted of in-person instruction—raised concerns regarding WV's health and precluded that option, thus depriving WV of potential benefit, especially when financial constraints later prevented the Parent from continuing private funding for all of WV's private services.

386.    The Parent sustained injuries independent of WV's injuries, such as the emotional distress, anger, hopelessness, desperation, sleeplessness, and inconvenience that foreseeably result when one's rights and expectations of fair treatment are frustrated and new financial burdens are imposed

to meet the needs for the college preparatory and transition services which the District should have provided to WV prior to his exit from high school.

**Count V**
**Retaliation, Intimidation, and Interference with Protected Acts of Advocacy**
**§504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act**
(The Parent against the District)

387.    Petitioners restate the preceding paragraphs as if set forth in full herein.

388.    WV is a qualified individual with disabilities under the ADA and Section 504 of the RA by virtue of being a student in the District, by having conditions that limit him in major life activities, as stated in the preceding paragraphs, by having a record of such disabilities, and by having received IEPs and Section 504 accommodation plan that provide him special education and accommodations for limitations in his ability to access and make progress in the general education curriculum.

389.    Insofar as, under the Section 504 regulations, the requirements for FAPE under Section 504 may be met through the implementation of an IEP, the Parent's exercise of the rights afforded to her by the IDEA likewise constitute acts of advocacy under Section 504 and the ADA and are, therefore protected acts under Section 504 and the ADA.

390.    The Parent engaged in acts statutorily protected by the Section 504 of the RA and the ADA when she invoked her and WV's rights under the IDEA such as rights to CSE meetings and pendency services.

391.     The defendant District knew that the Parent engaged in acts and that she availed of rights statutorily protected by Section 504 and the ADA in light of the involvement of Ms. Jeanne Farruggio in the decision making process regarding WV's education program and Ms. Farruggio's position as the District's Section 504 co-ordinator.

392.    With the ultimate goal of terminating the Parent's stringent advocacy for WV, the District subjected the Parent and WV to adverse acts, as set forth below, that served to prematurely and permanently terminate the very basis for the the Parent's advocacy—i.e. WV's entitlement to educational services from the District.

**Interference and Other Adverse Acts Caused by the Parent's Protected Activities**

393.    The District interfered with the Parent's protected acts by failing to grant her the CSE meeting to which the Parent was entitled, and doing so for an improper purpose or reason, as set forth below.

394.    The District's failure to perform such ministerial duties like convening an annual review under the IDEA were motivated by an improper purpose—i.e. to curtail the Parent's advocacy so that WV can be made to graduate that school year, notwithstanding a student's entitlement to

remain in school until he meets the performance standards expected of all diploma recipients or until he turns 21 years of age.

395.    Insofar as WV is not yet 21, and WV had not yet met those milestones applicable to all diploma recipients, the District's insistence on his graduation in June 2020 through the imposition on WV of a lower graduation standards compared to students without disabilities obstructed the Parent's further advocacy by prematurely terminating his rights to procedures under the IDEA and all access to free public education for the subsequent school years.

396.    The District's failed to convene a CSE meeting because the Parent had requested several accommodations, had given Ms. Farruggio notice of her concern that WV was not yet ready for graduation, and had requested a delay in his graduation, and Ms. Farruggio intended to prevent the Parent from formalizing the request in a forum protected by procedural safeguards.

397.    Not only did the denial of a CSE meeting silence the Parent in her advocacy in the school setting, it also obstructed further advocacy in other fora, such as an impartial hearing or the courts, insofar as the absence of a meeting prevented the creation of any documentary record of the Parent's requests and the opinions and responses of CSE members that may deem such requests reasonable.

398.    Ms. Farruggio also failed to invite the Parent to the conversation with Principal Trippodo and the Child Study Team for the improper purpose of denying her the information she needed to properly advocate for WV's needs—e.g. an open exchange of ideas with other school staff, a determination of WV's true level of functioning and needs, and a written record, among others.

399.    Insofar as Ms. Farruggio had already predetermined the accommodations she was willing to allow, she sought to limit the Parent's opportunities for requesting the others with which Ms. Farruggio or the District disagreed.  Thus the Parent was informed of the meeting with Principal Trippodo only after the decision had already been made to offer the Parent the single option that the District was willing to allow WV—a Covid 19 medical hardship exemption.

400.    However, in offering the accommodation, the District omitted relevant information regarding its intended use, thus interfering with Parent's advocacy.  By presenting the Covid 19 medical hardship exemption as an accommodation intended to preserve WV's grades but then failing to inform the Parent that it would be used as a basis for having WV exit high school without having achieved the functional skills expected of all students, the District deprived Parent of information needed to determine whether or not the accommodation was a reasonable one.

401.    The District refused to offer WV the pendency services to which he was entitled for the improper purpose of coercing the Parent into accepting her only other option for obtaining funding for WV's  needed services—the resolution agreement—and, thus, necessarily waiving her rights to filing claims in court for relief available under Section 504/ADA and other non-IDEA statutes.

402.    Coercing the Parent into waiving her rights to file claims that are "in any way related" to the current administrative complaint, also potentially limited the courses of action available to the Parent's attorneys for her related claims pending in federal court.

403.    To further restrict the Parent's options by making the prospect of accepting any form of pendency placement undesirable—and even potentially harmful to WV--in light of the District's knowledge of WV's compromised immune system, the District insisted that WV's pendency placement consisted of in-person instruction, in contravention to its own argument that remote instruction was an authorized alternative mode of instructional delivery during the pandemic and the fact that the District continued to offer its other students the option to avail of remote or hybrid instruction during the 2020-21 SY.

404.    By unlawfully denying WV a pendency placement and then, in the event that the Parent agrees to the District's placement, improperly imposing undesirable conditions to the pendency placement that the District does not impose on other students attending that setting,  the District effectually restricted Parent's options to private funding or to the services tied to the settlement agreement and that settlement's requirement that Parent and WV waive their rights to seek remedies in courts.

### Injuries Sustained

405.    The Parent reiterates the injuries stated under Counts III and IV

406.    The District deprived the Parent of her right to be free from intimidation and interference in her advocacy for her disabled child.

407.    The District effectively chilled the Parent's advocacy by depriving her of the basis for her advocacy.

408.    The District deprived the Parent of the return of her investment in being a resident of the school district and her personal interest in her child's access to the educational program provided by the District to the nondisabled children of other residents.

409.    The District inflicted upon the Parent injuries in the form of the foreseeable frustration, anger, despair, and feelings of helplessness and hopelessness that proximately result from being bullied and having her extensive efforts unjustly thwarted by government officials who callously disregard procedural safeguards specifically instituted to protect those rights, or who act with bad faith, and with gross misjudgment.

410.    As a result of William's continued need for support in self-management, in the event that William does continue with the family's original plans for him to go to college, and for the Parent's ambitions to support him in that endeavor, the District's failure to prepare WV for college prior to his graduation has increased the Parent's financial burden to the extent that the Parent's must also pay for supplemental support services WV will need to succeed in college.

411.    Insofar as WV should have remained eligible for free public education while he continued to develop his self management skills, and the Ardsley HS curriculum offered courses that allowed the student to earn college credits at a relatively low cost prior to high school graduation—e.g. through Advanced Placement or dual enrollment courses—the District's premature termination of

WV's eligibility for free public education deprived the Parent and WV of those benefits and increased the Parent's financial burden in sending WV to college.

**Count VI**
**Deprivation of the Parent's Rights**
**to the Equal Protection of the Laws   Under the 14th Amendment**
**By District Personnel Acting Under the Color of Law**
**42 U.S.C. § 1983**
(The Parent against the District and Jeanne Farruggio in her individual capacity)

412.    The Parent restate the preceding paragraphs as if set forth in full herein.

413.    The Parent's rights under the Fourteenth Amendment are clearly established rights of which the District and Ms. Farruggio, in her individual capacity, should have known.

414.    The District and Ms. Farruggio, in her individual and official capacities, while acting under the color of law, deprived the Parent of her 14th Amendment rights to due process and to the equal protection of the laws when, in  dealing with the Parent under multiple similar circumstances that required the implementation of facially neutral policies, the District selectively, arbitrarily, and capriciously enforced those same policies, as set forth below.

415.    The District, often through Ms. Farrugio, interfered with the Parent's rights to equal protection of the laws under the 14th Amendment and did so for impermissible purposes that include

- retaliating against the Parent for opposing the District's discriminatory practices and for her diligent exercise of her fundamental right, as a parent, to guide the care and education of her child, and
- bullying, punishing, or otherwise intimidating into submission the Parent, who is an outspoken advocate, through the arbitrary and capricious exercise of the District's authority to deprive the Parent of a forum to share her viewpoints, as well as of the basis of the Parent's advocacy—her children's entitlement to free public education and FAPE.

**Selective and Arbitrary Enforcement of the Mandate to Review the IEP At Least Annually**

416.    Over the multiple years that Parent's children have received IEPs from the District, the District has implemented a policy/practice of inviting the Parent (and other parents of students with IEPs) to a meeting of the CSE, or Subcommittee thereof, prior to the end of the school year, for the purpose of conducting an Annual Review of the IEP.

417.    Typically, the District heralds the request for such an Annual Review with a meeting notice explaining  that  the Subcommittee on Special Education (or the CSE) is "required by regulation to meet and conduct a periodic review, at least annually" and that "[t]he purpose of the meeting is to assess [the] child's progress in special education and to make any appropriate changes brought to the Committee's attention regarding [the] child's educational program for the following year."

418.    In light of the State's mandate, under 8 NYCRR 200.4(f), that the IEP "shall be reviewed…not less than annually," and the absence of any condition allowing its waiver, the duty to convene a meeting for this purpose is ministerial in nature and should not be diminished or eliminated by issues specific to the student in question—e.g. graduation status.

419.    To the extent that the said regulation allows for more frequent review than annually and the stipulation, under 8 NYCRR 200.4(f)(2), that the IEP "must be revised" to address the student's needs, if a student's specific issues were to influence the implementation of this mandate, they should lead to IEP reviews that are more frequent than annually, not less.

420.    With some exceptions, the District has generally complied with its ministerial duty to arrange for the Parent a meeting with the CSE, or Subcommittee thereof, prior to the end of the school year to determine the educational needs of the Parent's three children who have had IEPs, and to determine their respective placements for the following year.

421.    Those instances wherein the District selectively failed to enforce this practice of granting the Parent a CSE meeting occurred in connection with times that the Parent has introduced questions or issues that do not comport with the CSE Chair's preconceived course of action for the student or when there existed available options for the student other than the ones that the District was willing to offer.

422.    This instant matter constitutes such an instance when the District, through Ms. Farruggio, has refused to comply with this process of granting the Parent a CSE meeting to conduct an Annual Review.

423.    While the determination of educational placement for a student with an IEP is a duty that falls on the CSE—especially in circumstances where the decision-making process require consideration of the differing opinions of multiple experts, including the Parent--Ms. Farruggio has, on occasion, assumed that role for herself alone, or in collusion with only a few select individuals.

424.    Thus, the District has expressly refused to convene a CSE at times of potential controversy, or circumstances contemplating services that the District does not usually provide through its own programs,  or when the opportunity arises to ensure an outcome that is advantageous for the District or Ms. Farruggio—e.g.  the permanent termination of the Parent's advocacy through her child's purported graduation, even if there exists a potential basis for the CSE to find that the student has not yet fulfilled graduation criteria.

425.    The following historical examples serve as comparators to illustrate the District's pattern of selectively enforcing the District's usual practice of convening a CSE, or Subcommittee thereof, for a review of the IEP to address the student's needs and determine his subsequent placement:

CSE Meeting requests that were denied

    a.  2015 CSE meeting that the Parent requested to address the needs of WV's brother, MV, as he prepared for his senior externship

- During the 2014-15 SY, the September 2014 CSE had discussed the plan for MV to participate in the senior externship -- a 4 week, 100-hour immersion in a community based work site.
- After having arranged for a worksite and a job coach, the Parent requested a CSE meeting to revise MV's IEP to reflect the goals of the job coach and other accommodations WV may need in his transition from full time classroom instruction to a community-based worksite.
- Ms. Farruggio refused the Parent's request, thus leaving MV to the care of a job coach who was not privy to the CSE's knowledge of MV's behavioral challenges and needs for accommodations as a student with a disability.

b.  2015-16 SY Annual Review that the Parent requested for MV prior to his graduation

- Notwithstanding the Parent's disagreement with the 2015-16 IEP and MV's unilateral placement in a non-public school program for the 2015-16 SY,  the District remained under an obligation to have a CSE review MV's updated level of functioning at the end of the school year and whether or not he remained  eligible for FAPE for the next school year.
- The District refused to convene for MV the CSE meeting that Parent requested for the purpose of reviewing his anticipated placement for the 2016-17 SY, including a discussion of graduation requirements.
- Instead of convening a CSE for an Annual Review, Ms. Farruggio held a non-CSE meeting to formulate MV's Exit Summary, after which, the District unilaterally declared Matthew as having graduated and, thereby,  discharged him from free public education.

c.  March 2016 CSE meeting that the Parent requested for WV prior to his contemplated removal from the mainstream school

- In 2016, the Parent requested a CSE meeting in light of WV's potential need for a more restrictive educational setting.
- The District offered to place WV in Intensive Day Treatment (IDT)—a full-time therapeutic program outside of the District's mainstream school-- for "30 plus" days, but refused to convene a CSE meeting to discuss its rationale for the recommendation, to discuss other potential options,  and to revise the IEP to reflect WV's removal from the mainstream setting for a substantial period of time.

Select Meetings that were convened and are worthy of note

d.   April 2016 CSE meeting requested by the District, but not for the purpose of addressing WV's demonstrated needs at that time

- After WV had an emotional crisis in school on March 21, 2016, and the Parent notified the District of her intent to seek private placement for WV, the District convened a CSE, but did not prepare to address WV's demonstrated needs.

- Notwithstanding a prior agreement for the school to conduct a FBA, and the school psychologist and teachers having witnessed WV's self injury during the episode, the CSE did not produce a FBA for discussion and for the formulation of a BIP. Instead, the CSE irrationally postponed the FBA-BIP.
- Notwithstanding the District's recommendation for WV to attend a therapeutic program— i.e. IDT—the CSE placed WV in the same program wherein he demonstrated escalating harmful behavior and did so without a BIP to prevent recurrence of the behavior.
- The CSE recommended WV's return to his prior placement because IDT no longer had a vacancy, and not because WV no longer needed a therapeutic setting.
- The CSE refused to consider placement in other interim therapeutic settings for the remainder of the school year notwithstanding the availability of such a setting at that time--e.g. the school chosen by the Parent (Westfield Day School).
- Thus, the District convened a CSE in name only, without having performed the evaluation which it could have performed, and with no intent to implement a change in WV's program at that time, notwithstanding its own recognition that such a change was necessary.

e.  June 2016 Annual Review for WV that the Parent had requested to be postponed

- In June 2016, WV was attending a unilateral private placement at the Westfield Day School.
- Weeks before the scheduled June 20, 2016 Annual Review of WV's IEP, the Parent requested a postponement of the meeting, reasoning that WV's independent evaluations had not yet been completed.
- Just two months earlier, on April 20, 2016, the CSE had just convened and had an opportunity to review and revise WV's IEP
- Ms. Farruggio denied the Parent's request to reschedule the June 2016 CSE meeting, without providing a reason for her denial other than "We will need to move forward with the Annual Review meeting scheduled on the 20th for [WV]."
- Even when, on the morning of the scheduled June 20, 2016 meeting, the Parent had again requested to reschedule the annual review—reasoning that she was the health care proxy for her then critically ill and hospitalized father, and that she felt it necessary to be at his bedside when the doctors arrived —Ms. Farruggio refused to reschedule the meeting and proceeded to hold it without the Parent.
- It turned out, after the meeting, that the CSE had also not completed an evaluation it needed to complete for discussion during the Annual Review.
- In the absence of new information, the CSE produced essentially the same IEP as was produced during the April 20, 2016 CSE meeting.

f.  August 2016 CSE meeting to review Independent Educational Evaluation

- Prior to convening the August 2016 CSE, the Parent had visited the State-approved, non-public schools to which the District had referred WV, and she had informed Ms. Farruggio of her willingness to transfer WV to one of those referred schools--the Karafin School.

- The meeting turned out to be a highly productive one in which Ms. Farruggio and the other the CSE members took note of the Independent Educational Evaluation, and were open to the Parent's suggestions regarding the goals that should be addressed in WV's IEP.
- This meeting illustrates that, when inclined to do so, Ms. Farruggio and the CSE are able to engage in a productive exchange of ideas with the Parent, to formulate IEP goals, and to select a placement based, overall, on consideration of the student's demonstrated needs and anticipated progress during the relevant time.

g. <u>Review of  WV's Progress in Karafin School – February 2017 CSE Meeting</u>

- During the August 15, 2016 CSE meeting, in which the Parent had expressed her agreement for WV to transfer to Karafin School, Ms. Farruggio anticipated the need to check WV's progress in his new school after his transfer and made sure to "build in" to the IEP the arrangement to schedule a CSE meeting <u>after the first marking period</u> of the 2016-17 SY.
- Thus, Ms. Farruggio demonstrated a willingness to convene an interim CSE meeting for WV in anticipation of WV's potential needs, even when there was no evidence yet that WV was experiencing problems in Karafin.

h. <u>April 2020 Exit Summary Meeting for WV</u>

- On April 24, 2020, the District convened a meeting to formulate WV's Exit Summary.
- Those who attended the meeting included Jeanne Farruggio (Asst. Superintendent for Special Education and usual CSE Chair for WV), Michelle Myers (school psychologist), Doreen Day (special education teacher), Jennifer Carron (speech pathologist), Sage Kim (regular education teacher), Alyssa Zelicoff (guidance counselor), and the Parent.
- It bears noting that, the meeting attendees included all necessary members of a CSE or Subcommittee thereof.
- While Ms. Farruggio could have converted the meeting to a CSE for an Annual Review to revise WV's then current program,  instead Ms. Farruggio made sure to clarify that the meeting was not a CSE meeting, but one intended to create an Exit summary.

i. <u>Discussion between Principal Danielle Trippodo, Ms. Farruggio, Mrs. Catucci, and the Child Study Team</u>

- It is undisputed that in June 2020, the Ardsley HS principal approved WV for a Covid 19 medical hardship exemption pursuant to a discussion held between Principal Trippodo, Ms. Farruggio, school psychologist Dawn Catucci, and the school's Child Study Team.
- Ms. Farruggio was aware of a need for a CSE meeting, in light of the Parent having previously requested accommodations for WV.
- Ms. Farruggio failed to invite the Parent to the discussion with Principal Trippodo, and thus prevented the Parent from discussing other options or otherwise more fully participating in the decision-making process.

j. <u>May 2021 SY Annual Review for DV</u>

- WV's brother, DV, who also received an IEP from the District, was expected to graduate in June, 2021.
- The Parent did not challenge this change in placement.
- The District made arrangements for an Annual Review and sent the Parent an invitation for the meeting, which was held on May 7, 2021.
- DV's Exit Summary was discussed at the same meeting.

426.    These historical examples illustrate the District's retaliatory animus towards the Parent, insofar as, when the Parent's conflicting opinion is anticipated, the District either refuses to convene a CSE, or otherwise fails to comply with the IEP formulation procedures and safeguards that allow meaningful parental participation in the creation of the student's program, or bases its decisions and recommendations on factors other than the student's needs. However, when it is expected beforehand that the Parent will be compliant with the District's recommendations, the District is willing to schedule a CSE meeting and to conduct that meeting in a manner that addresses the student's needs.

427.    In this instant matter—wherein the District had a duty to conduct an Annual Review of WV's IEP at the end of the 2019-20 SY--Ms. Farruggio failed to convene a CSE meeting to assess WV's academic progress and determine his educational placement for the following year.

428.    Ms. Farruggio had been aware of other indications for convening a CSE insofar as she was informed of the Parent's concerns that WV was not meeting his IEP goals, and it was apparent that school staff also found enough reason to be concerned for WV's educational performance, such that Ms. Farruggio, the Child Study Team, and Principal Trippodo considered WV for a medical hardship exemption.

429.    In light of the failure on the part of the Parent and Ms. Farruggio to agree to the contents of an IEP amendment without a meeting, it was evident that the District needed to convene a CSE pursuant to 8 NYCRR 200.4(f)(2).

430.    However, instead of convening a CSE to review WV's progress and the Parent's concerns regarding WV's regression, the District issued WV a diploma without holding an IEP review, thereby depriving the Parent of the information she needed to learn from other school personnel to determine if the termination of WV's eligibility for an IEP was appropriate at that time.

431.    It is clear from the conduct of Ms. Farruggio in this matter, and of the District in general in the illustrative cases previously mentioned, that the District's selective enforcement of the practice of convening a CSE to conduct IEP reviews were motivated by a retaliatory animus towards the Parent for her opposition against discriminatory practices. By denying the Parent access to to a CSE meeting, the District effectually thwarted the Parent's efforts and prevented her from sharing viewpoints contrary to the District's or Ms. Farruggio's.

432.    Ms. Farruggio's decision to refrain from convening a CSE for WV's IEP Review in 2020 was motivated by bad faith and the impermissible purpose of retaliating against the Parent and punishing her for her due diligence in the exercise of her fundamental parental rights to guide the care and education of her children within the limits prescribed by law--including but not limited to

her seeking educational services and accommodations for their disabilities—and for her being outspoken in her challenges to the validity of the policies and practices espoused by Ms. Farruggio and the District and to the CSE Chair's knowledge and authority regarding contested issues.

433.    Therefore, although WV and DV were similarly situated in the year of their scheduled graduation, the District convened an Annual Review for DV, whose graduation the Parent did not contest, but it refrained from conducting an Annual Review for WV, for whom the Parent sought additional accommodations prior to graduation.

434.    Insofar as the attendees of WV's April 2020 Exit Summary meeting included all necessary members of a Subcommittee on Special Education, and in light of the mandate to hold an IEP Review, there is no rational basis for Ms. Farruggio's failure to conduct an Annual Review by a CSE to address WV's then evident needs, including arranging for an updated FBA-BIP in light of certain provisions of the prior BIP being rendered unimplementable by the conversion to remote instruction.

435.    Insofar as DV's Annual Review meeting also served as his Exit Summary Meeting, there is no rational basis for Ms. Farruggio failing to allow similar arrangements for the April 24, 2020 meeting, so that the attendees can review and revise WV's IEP, in light of his evident need for an updated FBA-BIP and the transition challenges imposed by the pandemic.  Instead, Ms. Farruggio opened the meeting by explicitly clarifying that it was not a CSE meeting.

436.    Insofar as Ms. Farruggio participated in a discussion with Principal Trippodo and the Child Study Team regarding WV's deterioration in functioning and his need for accommodations such as the Covid 19 medical hardship exemption, there is no rational basis for Ms. Farruggio to have failed to, instead, convene a CSE and to allow the Parent to meaningfully participate in the decision regarding how to accommodate WV's needs.

437.    In light of Ms. Farruggio's denial of Parent's request to postpone WV's June 2016 Annual Review-- and her insistence that it proceed, notwithstanding its futility, and even when the Parent was unable to attend-- there is no rational basis or legitimate government policy that would justify Ms. Farruggio's failure to hold an Annual Review for WV in June 2020.

438.    Insofar as there have been instances wherein Ms. Farruggio had arranged for CSE meetings even without a clear objective or intervention plan for the meeting (e.g. April 2016; February 2017), there is no rational basis or legitimate government policy that would justify her refusal to convene a CSE meeting in response to the WV's demonstrated need for one in June 2020 and the Parent's requests for specific accommodations that required deliberation by the CSE.

439.    Rather than engage in a reasonable discussion with the Parent over matters of controversy, Ms. Farruggio sought to bully or otherwise intimidate and coerce the Parent into submitting to Ms. Farruggio's authority by arbitrarily depriving the Parent of her property and liberty interests in a forum that ensured her right to share information regarding her children, to express her viewpoints, and to otherwise participate in decisions regarding the education of her child—i.e. the CSE meeting.

440.    By altogether denying the Parent the opportunity to share her viewpoints and possibly convince the CSE to provide WV an IEP for the following school year,  Ms. Farruggio sought to unilaterally and prematurely remove from the Parent the subject of her advocacy—WV's  access to free public education and FAPE—notwithstanding the existence of a basis for WV's continued eligibility to access those benefits.

## Selective and Arbitrary Enforcement of the Inclusion of College Classes in the Scope of the Ardsley HS Curriculum

441.    To deprive the Parent of her interest in pendency services under the IDEA for WV, the District selectively and arbitrarily enforced its policies for recognizing a student's attendance in college classes as part of Ardsley HS's regular educational program.

442.    In this instant matter, the Parent had invoked her rights under the IDEA to have WV avail of a pendency placement during the 2020-21 SY, and the District had asserted that, if WV were deemed eligible for pendency services, his placement would be Ardsley High School.

443.    While WV's private program included college level classes that the Parent asserted to be substantially similar to one which WV could have attended, in light of the broad spectrum of course offerings available as elective courses through the Ardsley HS program, the District argued that the college level classes in which WV enrolled should not be considered substantially similar to attendance in Ardsley HS.

444.    On the other hand, in the matter of MV—who could not have been enrolled in Ardsley HS during the 2015-16 SY by virtue of his simultaneous enrolment in a non-public high school program at Step Forward/GCC—the District recognized WV's attendance in college classes at the WCC campus as enrollment in Ardsley HS, for the improper purpose of allowing the District to justify the Ardsley HS's improper assimilation of  MV's college credits into his Ardsley HS transcript without MV's permission for a formal transfer of credits.  In so doing, the District terminated MV's access to FAPE and free public education for the 2016-17 SY and thereafter.

445.    Thus, the District selectively and arbitrarily defined and enforced the scope of enrollment in Ardsley HS and the scope of its education program, and did so in bad faith for the impermissible purpose of punishing the Parent by causing her the loss of her property interest in pendency services for WV, in retaliation for her refusal to waive her right to bring suit in court as part of the District's settlement offer.

## Selective and Arbitrary Enforcement of the Option to Receive Instruction Remotely

446.    For the 2019-20 SY, both WV and his brother DV were provided IEPs that placed them in the regular educational setting with the support of related services.  During the pandemic, the District delivered their instruction remotely.

447.    Parent advocated for both WV and DV to receive continued services for the 2020-21 SY.

448.    For the 2020-21 SY, DV's placement continued in the same regular education setting as his 2019-20 IEP, and his classes and services were provided through the Ardsley HS.

449.    Like other students of the District attending the Ardsley HS regular education program during the pandemic, DV was offered the option to receive remote instruction either entirely or through a hybrid model that included part-time in-person instruction.

450.    For WV, the District asserted that, should WV be deemed eligible for pendency, then his pendency would consist of the placement provided in his 2019-20 IEP. Therefore, the District's proposed pendency placement for WV should have entailed the continuation of the placement and services in the regular education setting in a manner similar to the implementation of DV's program for the 2020-21 SY.

451.    However, unlike its treatment of DV's placement, the District specifically rejected the prospect of remote instruction for WV and, instead, asserted that WV's placement would consist of in-person instruction, notwithstanding its contention that remote instruction is an authorized alternative mode of instruction for its other students.

452.    The District's differential treatment of WV—which subjected WV to increased risks of severe illness from Covid infection, in light of his known underlying medical conditions and compromised immune system—served to make the prospect of availing of pendency placement in Ardsley HS untenable for WV.

453.    Thus, the District selectively enforced the option to avail of remote instruction for the purpose of punishing the Parent for her refusal to waive her rights to file a suit in court, thus leaving her no option but to either fund WV's private services privately or go without such services while awaiting the decision of the court.

454.    In selectively enforcing facially neutral policies and practices to the disadvantage of the Parent, and doing so for impermissible purposes, the District acted with reckless disregard for the Parent's clearly established rights to the equal protection of the laws under the Fourteenth Amendment.

## Injuries Sustained

455.    The Parent reiterates the injuries stated under Counts III and IV.

456.    The District's selective enforcement of its policies, separately and in the aggregate, deprived the Parent of her right to be free from discrimination for impermissible purposes--such as retaliation for the exercise of her rights--and from the arbitrary and capricious acts of the government.

457.    The District's selective enforcement of the mandate to convene a CSE deprived the Parent of a forum to express her viewpoints to other CSE members and to access relevant information she needed in the exercise of her right to guide the care and education of WV.

458.    The District's discriminatory treatment contributed to the misperceptions that the Parent's private program did not qualify as pendency placement, thus depriving the Parent of her interest in pendency services for WV and requiring her to either privately fund services for WV to the extent she can afford or forego them.

459.    The Parent was made to suffer the foreseeable injuries of frustration, anger, despair, and feelings of helplessness and hopelessness that proximately results from being bullied and having her extensive efforts unjustly thwarted by individuals who abuse their authority or selectively enforce policies in bad faith.


DATED: June 16, 2021


Respectfully submitted,
s/Maria Theresa C. Vinluan
*Pro se* Plaintiff
95 Bradley Ave.
White Plains, NY 10607
Phone: (917)757-8236
Email: tescvin@gmail.com